Execution Version

# DEFINITIVE AGREEMENT

by and among

## ST. LUKE'S HEALTH NETWORK, INC.,

and

## SAINT LUKE'S HOSPITAL OF BETHLEHEM, PENNSYLVANIA D/B/A ST. LUKE'S HOSPITAL & HEALTH NETWORK,

and

## WARREN HEALTHCARE, INC.,

and

## WARREN HOSPITAL

APRIL 22, 2011

688197.15



## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | | DEFINITIONS ..................................................................................................2 |
| | 1.1. | DEFINED TERMS.............................................................................................2 |
| | 1.2. | INTERPRETATION OF CERTAIN REFERENCES.....................................................9 |
| | | |
| II. | | THE TRANSACTION ..........................................................................................9 |
| | 2.1. | THE HOSPITAL REORGANIZATION.....................................................................9 |
| | 2.2. | THE WARREN REORGANIZATION.....................................................................10 |
| | 2.3. | OTHER MATTERS..........................................................................................10 |
| | | |
| III. | | FINANCIAL AND OPERATIONAL COVENANTS OF THE PARTIES.................11 |
| | 3.1. | CAPITAL CONTRIBUTION TO WARREN OR THE HOSPITAL...................................11 |
| | 3.2. | CONTINUATION OF THE HOSPITAL AS FULL SERVICE ACUTE CARE HOSPITAL. .........11 |
| | 3.3. | HOSPITAL GOALS AND OBJECTIVES..................................................................12 |
| | 3.4. | HOSPITAL CLINICAL SERVICES.......................................................................12 |
| | 3.5. | INTEGRATION AND COLLABORATION.................................................................12 |
| | 3.6. | ALLOCATION OF OVERHEAD EXPENSES.............................................................13 |
| | 3.7. | AFFILIATIONS...............................................................................................13 |
| | 3.8. | MEDICAL SCHOOL RELATIONSHIPS..................................................................13 |
| | 3.9. | MEDICAL STAFF............................................................................................13 |
| | 3.10. | BRAND AND IMAGE........................................................................................13 |
| | | |
| IV. | | CLOSING ......................................................................................................13 |
| | 4.1. | CLOSING AND EFFECTIVE DATE.......................................................................13 |
| | 4.2. | CLOSING DELIVERIES....................................................................................14 |
| | | |
| V. | | REPRESENTATIONS AND WARRANTIES OF THE WARREN ENTITIES .............16 |
| | 5.1. | ORGANIZATION.............................................................................................16 |
| | 5.2. | CORPORATE POWERS; CONSENTS.....................................................................16 |
| | 5.3. | TAX-EXEMPT STATUS....................................................................................17 |
| | 5.4. | MEMBERSHIP AND OTHER INTERESTS AND ARRANGEMENTS.................................17 |
| | 5.5. | BINDING EFFECT...........................................................................................17 |
| | 5.6. | FINANCIAL STATEMENTS...............................................................................18 |
| | 5.7. | BOOKS AND RECORDS...................................................................................19 |
| | 5.8. | LICENSES, PERMITS AND OTHER GOVERNMENT AUTHORIZATIONS........................19 |
| | 5.9. | CERTIFICATES OF NEED..................................................................................20 |
| | 5.10. | LEGAL AND REGULATORY COMPLIANCE............................................................20 |
| | 5.11. | MEDICARE PARTICIPATION; COST REPORTS; ACCREDITATION, THIRD PARTY INSURANCE...................................................................................................20 |
| | 5.12. | LITIGATION OR PROCEEDINGS.........................................................................22 |
| | 5.13. | COMPLIANCE PROGRAM.................................................................................22 |
| | 5.14. | TAXES.........................................................................................................22 |
| | 5.15. | BOND DEBT AND OTHER FINANCIAL OBLIGATIONS.............................................23 |
| | 5.16. | REAL PROPERTY............................................................................................24 |
| | 5.17. | OTHER PROPERTY; TITLE...............................................................................26 |
| | 5.18. | ENVIRONMENTAL MATTERS............................................................................27 |
| | 5.19. | CONSTRUCTION IN PROGRESS.........................................................................28 |
| | 5.20. | MEDICAL STAFF MATTERS.............................................................................28 |
| | 5.21. | RESTRICTED ASSETS / ENDOWMENT................................................................28 |
| | 5.22. | INSURANCE..................................................................................................29 |
| | 5.23. | MATERIAL CONTRACTS.................................................................................30 |

| | | |
|---|---|---|
| 5.24. | COMPUTER SOFTWARE, ETC. | 31 |
| 5.25. | EQUIPMENT. | 31 |
| 5.26. | INVENTORY AND SUPPLIES. | 32 |
| 5.27. | PATENTS, TRADEMARKS, ETC. | 32 |
| 5.28. | EMPLOYEES. | 33 |
| 5.29. | LABOR RELATIONS; COMPLIANCE. | 34 |
| 5.30. | EMPLOYEE BENEFIT PLANS. | 34 |
| 5.31. | CERTAIN CHANGES. | 37 |
| 5.32. | CERTAIN AFFILIATE TRANSACTIONS. | 38 |
| 5.33. | BANK ACCOUNTS, OFFICERS AND POWERS OF ATTORNEY. | 39 |
| 5.34. | BROKERS AND FINDERS. | 39 |
| 5.35. | HILL-BURTON OBLIGATIONS. | 39 |
| 5.36. | NO OMISSIONS OR MISSTATEMENTS. | 39 |
| **VI.** | **REPRESENTATIONS AND WARRANTIES OF ST. LUKE'S ENTITIES** | **40** |
| 6.1. | ORGANIZATION. | 40 |
| 6.2. | CORPORATE POWERS; CONSENTS; NO CONFLICTS. | 40 |
| 6.3. | TAX-EXEMPT STATUS. | 41 |
| 6.4. | BINDING EFFECT. | 41 |
| 6.5. | FINANCIAL INFORMATION. | 41 |
| 6.6. | BROKERS AND FINDERS. | 42 |
| 6.7. | GOVERNMENT AUTHORIZATIONS. | 42 |
| 6.8. | MEDICARE PARTICIPATION; COST REPORTS; ACCREDITATION. | 42 |
| 6.9. | LITIGATION OR PROCEEDINGS. | 42 |
| 6.10. | COMPLIANCE PROGRAM. | 42 |
| 6.11. | TAX-EXEMPT BOND DEBT. | 43 |
| 6.12. | NO OMISSIONS OR MISSTATEMENTS. | 43 |
| **VII.** | **COVENANTS OF THE WARREN ENTITIES PRIOR TO CLOSING** | **43** |
| 7.1. | ACCESS AND INVESTIGATION. | 43 |
| 7.2. | OPERATION OF WARREN COMPANY BUSINESSES. | 43 |
| 7.3. | CONSENTS. | 44 |
| 7.4. | RISK OF LOSS. | 44 |
| 7.5. | ANTITRUST. | 45 |
| 7.6. | NO-SHOP CLAUSE. | 45 |
| 7.7. | UPDATES OF REPRESENTATIONS AND WARRANTIES; SCHEDULES. | 45 |
| 7.8. | HSR FILING. | 46 |
| 7.9. | COOPERATION REGARDING BONDS. | 46 |
| 7.10. | CHAPA FILING. | 47 |
| **VIII.** | **COVENANTS OF THE ST. LUKE'S ENTITIES PRIOR TO CLOSING** | **47** |
| 8.1. | ACCESS AND INVESTIGATION. | 47 |
| 8.2. | CONSENTS. | 47 |
| 8.3. | UPDATES OF REPRESENTATIONS AND WARRANTIES; SCHEDULES. | 47 |
| 8.4. | ANTITRUST. | 47 |
| 8.5. | HSR FILING. | 48 |
| 8.6. | WARREN BONDS. | 48 |
| 8.7. | COOPERATION IN CHAPA FILING. | 48 |
| **IX.** | **CONDITIONS TO WARREN ENTITIES' OBLIGATIONS** | **49** |
| 9.1. | REPRESENTATIONS; WARRANTIES; COVENANTS. | 49 |
| 9.2. | PERFORMANCE. | 49 |
| 9.3. | CONSENTS. | 49 |
| 9.4. | ABSENCE OF ACTIONS OR PROCEEDINGS. | 49 |
| 9.5. | ANTITRUST. | 49 |
| 9.6. | CHAPA. | 49 |

|         | 9.7.   | TAX MATTERS. | 50 |
|         | 9.8.   | GOVERNMENT INVESTIGATION; PAYMENTS; REPORTING. | 50 |
| **X.**  |        | **CONDITIONS TO ST. LUKE'S ENTITIES' OBLIGATIONS** | 50 |
|         | 10.1.  | REPRESENTATIONS; WARRANTIES; COVENANTS. | 50 |
|         | 10.2.  | NO MATERIAL ADVERSE CHANGE. | 51 |
|         | 10.3.  | PERFORMANCE. | 51 |
|         | 10.4.  | PLAN OF RESTRUCTURING. | 51 |
|         | 10.5.  | POST-FORECLOSURE ARRANGEMENTS WITH WELLS FARGO BANK, N.A. | 51 |
|         | 10.6.  | PLAN TO PAY CREDITORS; USE OF FUNDS. | 53 |
|         | 10.7.  | REQUIRED CONSENTS. | 53 |
|         | 10.8.  | ABSENCE OF ACTIONS OR PROCEEDINGS. | 53 |
|         | 10.9.  | GOOD STANDING CERTIFICATES. | 53 |
|         | 10.10. | DUE DILIGENCE REVIEW. | 53 |
|         | 10.11. | TITLE INSURANCE. | 53 |
|         | 10.12. | OPINIONS OF COUNSEL. | 54 |
|         | 10.13. | RECEIPT OF APPRAISALS, VALUATIONS AND OTHER EVALUATIONS | 54 |
|         | 10.14. | SECRETARY'S CERTIFICATE | 54 |
|         | 10.15. | ANTITRUST. | 54 |
|         | 10.16. | CHAPA. | 54 |
|         | 10.17. | TAX MATTERS. | 54 |
| **XI.** |        | **TERMINATION** | 55 |
|         | 11.1.  | TERMINATION. | 55 |
|         | 11.2.  | EXPENSE REIMBURSEMENT UPON TERMINATION. | 55 |
|         | 11.3.  | SCHEDULES. | 56 |
| **XII.**|        | **INDEMNIFICATION** | 56 |
|         | 12.1.  | INDEMNIFICATION OF ST. LUKE'S ENTITIES BY WARREN ENTITIES | 56 |
|         | 12.2.  | INDEMNIFICATION OF WARREN ENTITIES BY ST. LUKE'S ENTITIES. | 58 |
|         | 12.3.  | INDEMNIFICATION ASSISTANCE. | 58 |
|         | 12.4.  | EFFECT OF INVESTIGATION OR KNOWLEDGE. | 59 |
|         | 12.5.  | SURVIVAL. | 59 |
| **XIII.**|       | **MISCELLANEOUS.** | 59 |
|         | 13.1.  | NO REFERRALS. | 59 |
|         | 13.2.  | PUBLIC ANNOUNCEMENTS. | 60 |
|         | 13.3.  | CONFIDENTIALITY. | 60 |
|         | 13.4.  | COOPERATION; FURTHER ASSURANCES. | 60 |
|         | 13.5.  | BINDING EFFECT. | 61 |
|         | 13.6.  | GOVERNING LAW; DISPUTE RESOLUTION. | 61 |
|         | 13.7.  | ENTIRE AGREEMENT; AMENDMENT. | 62 |
|         | 13.8.  | ASSIGNMENT. | 62 |
|         | 13.9.  | WAIVER. | 62 |
|         | 13.10. | HEADINGS. | 62 |
|         | 13.11. | NOTICES; CORRESPONDENCE; MEETINGS. | 62 |
|         | 13.12. | FEES AND EXPENSES. | 63 |
|         | 13.13. | NO THIRD PARTY BENEFICIARIES. | 63 |
|         | 13.14. | COUNTERPARTS; FACSIMILE SIGNATURE. | 64 |

**Exhibits:**

| | |
|---|---|
| Exhibit 1: | Warren Healthcare System Investment Interests |
| Exhibit 2 | St. Luke's Organizational Chart |
| Exhibit A: | Amended and Restated Certificate of Incorporation of Hospital |
| Exhibit B: | Amended and Restated Bylaws of Hospital |
| Exhibit C: | Amended and Restated Certificate of Incorporation of Warren |
| Exhibit D: | Amended and Restated Bylaws of Warren |
| Exhibit E: | Amended and Restated Certificate of Incorporation of the Foundation |
| Exhibit F: | Amended and Restated Bylaws of the Foundation |
| Exhibit G: | Opinion of Counsel for Warren Entities |
| Exhibit H: | Post-Foreclosure Agreement |
| Exhibit I-1: | Form of Required Estoppel Certificate (Tenant Leases) |
| Exhibit I-2: | Form of Required Estoppel Certificate (Warren and New Hospital Leases) |
| Exhibit J: | Confidentiality Agreement |
| Exhibit K: | Copies of Warren Operating and Capital Budgets for Fiscal Year 2011 |

**Schedules:**

| | |
|---|---|
| Schedule 2.1(b) | List of Board of Trustee Members for Hospital |
| Schedule 2.2(c) | List of Board of Trustee Members for St. Luke's and St. Luke's Hospital |
| Schedule 3.1 | Funds Flow Memorandum |
| Schedule 3.3 | Hospital Goals and Objectives |
| Schedule 4.2(a)(xvi) | Persons with Amended Executive Officer Employment Agreements |
| Schedule 5.2 | Required Consents for Warren |
| Schedule 5.4 | Restrictions on Warren's Ownership Interests or Other Rights |
| Schedule 5.6 | Contingent or Other Liabilities |
| Schedule 5.8 | Licenses and Other Authorizations |
| Schedule 5.9 | Certificate of Need Applications |
| Schedule 5.10 | Legal and Regulatory Compliance |
| Schedule 5.11(a) | No Investigations |
| Schedule 5.11(b) | Unsettled Cost Reports |
| Schedule 5.11(c) | No Claims or Appeals |
| Schedule 5.11(d) | Noncompliant Billing, Overpayments, Exclusions |
| Schedule 5.11(e) | Contingent accreditation |
| Schedule 5.11(f) | Joint Commission Required Policies to be Effectuated |
| Schedule 5.12 | Pending Litigation or Proceedings |
| Schedule 5.13 | Corporate Integrity Agreement and Other Required Reports |
| Schedule 5.14(a) | Tax Returns Due |
| Schedule 5.14(b) | Current Tax Audits |
| Schedule 5.14(e) | Taxes Due |
| Schedule 5.15 | Outstanding Debt |
| Schedule 5.15(a) | Events of Default |
| Schedule 5.15(c) | Required Approvals for Hospital and Parent Substitution |
| Schedule 5.15(g) | Private Use Disclosures |
| Schedule 5.16(a) | Warren Real Property (Owned and Leased) |

Schedule 5.16(b)       Mortgages on Real Property Owned by Warren
Schedule 5.16(d)       Tenant Leases
Schedule 5.16(e)       Condition and Repair of Improvements to Real Property
Schedule 5.16(f)       Notices of Violations, Condemnation, etc.
Schedule 5.17          Restrictions on Title to Property
Schedule 5.18          Environmental Disclosures
Schedule 5.19          Projects in Process
Schedule 5.20          Medical Staff Disputes
Schedule 5.21          List of Restricted Assets
Schedule 5.22(a)       List of Insurance Policies
Schedule 5.22(b)       Required Repairs
Schedule 5.22(c)       Loss experience
Schedule 5.22(d)       Refusal to Issue Policy, Unpaid Premiums, etc.
Schedule 5.22(e)       Insurance Policies - Notices
Schedule 5.22(f)       Insurance Policies - Premiums and Obligations
Schedule 5.22(g)       Funding Exceptions
Schedule 5.23          List of Material Contracts
Schedule 5.23(d)       List of certain Material Contracts and Third-Party Relationships
Schedule 5.23(e)       Contracts Requiring Approval of Transaction
Schedule 5.23(f)       Contracts that would Require Payment of Penalties, etc.
Schedule 5.24          Royalties etc. Related to software
Schedule 5.25          Condition of Equipment
Schedule 5.27          IP in Use
Schedule 5.28          List of Employees/Retirees
Schedule 5.29          Labor Matters
Schedule 5.30(a)       Employee Benefit Plans
Schedule 5.30(d)       Obligations to be Performed
Schedule 5.30(d)(ii)   Determination Letters
Schedule 5.30(e)       Severance etc. Agreements
Schedule 5.30(f)       Tax Liability for Severance Arrangements
Schedule 5.30(h)       Plan Liabilities
Schedule 5.30(l)       Prohibited Transactions
Schedule 5.31          Change in Financial Conditions
Schedule 5.32          Interests of individuals
Schedule 5.33          Bank Accounts, Officers/Directors, Powers of Attorney
Schedule 5.35          Hill-Burton Obligations
Schedule 6.2           Required Consents for St. Luke's
Schedule 6.9           Litigation or Proceedings
Schedule 7.9           Transactions with Respect to Warren Bonds and HFG Agreement
Schedule 10.2          No Material Adverse Change
Schedule 10.4          Plan of Restructuring
Schedule 10.6          Plan to Pay Creditors
Schedule 10.13         Appraisals, Valuations and Other Evaluations
Schedule 10.14         Form of Secretary's Certificate

### DEFINITIVE AGREEMENT

THIS DEFINITIVE AGREEMENT (the "Agreement") is executed this 22nd day of April, 2011, by and among ST. LUKE'S HEALTH NETWORK, INC. ("St. Luke's"), a Pennsylvania nonprofit corporation, and SAINT LUKE'S HOSPITAL OF BETHLEHEM, PENNSYLVANIA, d/b/a/ ST. LUKE'S HOSPITAL & HEALTH NETWORK ("St. Luke's Hospital"), a Pennsylvania nonprofit corporation (the foregoing are sometimes collectively referred to as the "St. Luke's Entities"), and WARREN HEALTHCARE, INC. ("Warren"), a New Jersey nonprofit corporation, and WARREN HOSPITAL (the "Hospital"), a New Jersey nonprofit corporation (the foregoing are sometimes collectively referred to as the "Warren Entities"). The St. Luke's Entities and the Warren Entities collectively may be referred to herein as the "Parties." St. Luke's and Warren may be referred to in this Agreement individually as a "Parent" and collectively as the "Parents."

### RECITALS:

WHEREAS, Warren is (i) the sole member of the Hospital, which owns and operates a 214 licensed bed general acute care hospital in Phillipsburg, Warren County, New Jersey; (ii) the sole member of the Warren Hospital Foundation, Inc. (the "Foundation"), a New Jersey nonprofit corporation serving as a public foundation to raise funds to support the mission of the Hospital and (iii) the sole stockholder in Two Rivers Enterprises, Inc. ("Two Rivers"), a New Jersey corporation which purpose is to facilitate the financing, acquisition and holding of property by or for the benefit of the Hospital or its Affiliates. The Affiliates consist of all the entities that Warren directly or indirectly owns, in whole or in part, or directly or indirectly controls, as shown on the Warren Healthcare Investment Interests chart, attached as Exhibit 1 hereto and made part hereof. Warren's interests in all the Affiliates are included in the Transaction;

WHEREAS, the Hospital (i) indirectly controls the following three (3) professional corporations employing physicians: Warren Health Care Alliance, PC, Hillcrest Emergency Services, PC, and Hillcrest Psychiatric Services, PC (collectively, the "Captive PCs"); (ii) owns Warren PA Professional Alliance, Inc., a Pennsylvania nonprofit corporation ("WPAPA" and, together with the Captive PCs, the "Physician Services Entities") that owns and operates a primary care physician practice at multiple locations in eastern Pennsylvania; and (iii) owns a fifty percent (50%) interest in Warren Risk Retention Group, Inc., a captive risk retention group domiciled in Vermont. The Physician Services Entities provide professional medical and related services to patients in the Hospital and at other locations within the Hospital's service area;

WHEREAS, the Warren Entities, their Affiliates, and the Physician Services Entities (individually referred to as a "Warren Company" and collectively referred to as the "Warren Companies") comprise an integrated health care delivery system serving the residents of Warren County, New Jersey and other local communities and responding to its communities' needs;

WHEREAS, the Warren Entities desire to have the Hospital remain a strong, vibrant community hospital and to continue to provide health care services to the communities it serves;

688197.15

WHEREAS, St. Luke's is the sole member of St. Luke's Hospital, St. Luke's Quakertown Hospital, Carbon-Schuylkill Community Hospital, Inc. d/b/a St. Luke's Miners Memorial Hospital, St. Luke's Emergency & Transport Services, Inc. d/b/a Lifestar, Quakertown Rehabilitation Center d/b/a St. Luke's Rehabilitation Center and St. Luke's Physician Group, Inc. f/k/a St. Luke's Health Services, Inc., many of which control affiliated organizations that are set out in the Organizational Chart attached as Exhibit 2 hereto (collectively, the "St. Luke's Affiliates");

WHEREAS, both the St. Luke's Entities and the Warren Entities share (i) a common vision to provide quality care and excellent outcomes for patients; (ii) a common healing mission and strong emphasis on community well-being through extensive outreach, education and prevention programs; (iii) a deeply held commitment to their respective charitable purposes; and (iv) a congruence of mission and values, including a fundamental commitment to quality care and community services;

WHEREAS, the St. Luke's Entities and the Warren Entities desire to integrate to develop and deliver a comprehensive continuum of care providing quality, cost-effective health care and related services throughout portions of Eastern Pennsylvania and Western New Jersey as set forth in this Agreement (the "Transaction"); and

WHEREAS, in addition to the foregoing, the Parties desire to enter into this Agreement to accomplish the following objectives: (i) enhance the ability of the Warren Entities to serve the members of their communities; (ii) improve access to comprehensive, convenient, quality inpatient and outpatient health care services (including primary and specialty care physicians) throughout the region; (iii) enhance the efficiency and efficacy of care, resulting in improved outcomes for patients; (iv) develop growth initiatives and service expansion opportunities that may exist for both the St. Luke's Entities and the Warren Entities; (v) heighten the operational efficiency of all services, and reduce the cost of delivering care, resulting in favorable financial performance for the St. Luke's Entities and the Warren Entities; (vi) promote community health and well-being through emphasis on prevention of illness, achievement of wellness and provision of a full continuum of care to the community; and (vii) otherwise further the charitable missions of both the St. Luke's Entities and the Warren Entities.

NOW THEREFORE, in consideration of the mutual agreements and covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

I.      DEFINITIONS

        1.1.    Defined Terms.

        In addition to those terms defined in the Recitals of this Agreement, the following terms have the respective meanings set forth below when used herein:

        "Accounts Receivable" shall have the meaning given such term in Section 5.6(c).

        "Affiliate" means, as to the Person in question, any Person that directly or indirectly controls, is controlled by, or is under common control with, the specified Person, and any

successors and assigns of such Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, membership interests, by contract or otherwise; provided that a stockholder or member of a Person shall not be deemed an "affiliate" of such Person merely on account of its status as a stockholder or member of such Person unless such stockholder or member owns or holds, directly or indirectly, at least 50% of the voting securities (if a stockholder) or voting rights (if a member) of such Person. For purposes of clarification, the Captive PCs are Affiliates of Warren.

"Allstate" means Allstate Investments LLC, the sole holder of the Warren Bonds, and the party with full authority to direct actions with respect to the amendment, forbearance or disposition thereof.

"Authority" shall have the meaning given such term on Section 7.9 hereof.

"Balance Sheet Date" means December 31, 2010.

"Benefit Program and Agreement" shall have the meaning given such term in Section 5.30(a) hereof.

"CHAPA" means the Community Healthcare Assets Protection Act, N.J.S.A. 26:2H-7.10.

"Church Parking Lease Amendment" shall mean an amendment to that certain Lease, dated September 28, 2007, between Warren Hospital and Church of St. Philip and St. James extending the term of the lease to at least April 30, 2086, on terms and conditions acceptable to St. Luke's in its sole discretion.

"Closing" shall have the meaning given such term in Section 4.1 hereof.

"Closing Date" shall have the meaning given such term in Section 4.1 hereof.

"Code" means the Internal Revenue Code of 1986, as amended to date, or any successor law, and all rules and regulations promulgated thereunder.

"CON" shall have the meaning set forth in Section 5.9.

"Confidentiality Agreement" shall have the meaning set forth in Section 13.3, a fully executed copy of which is attached hereto as Exhibit J.

"Consent" means any approval, consent, ratification, waiver or authorization, including any Government Authorization, by any Person.

"Contract" means any agreement, contract, obligation, promise or undertaking (whether written or oral and whether express or implied) that is legally binding, including all amendments.

"Contribution" shall have the meaning given such term in Section 3.1(a).

3

"Contribution Balance" shall have the meaning given such term in Section 3.1(b).

"Derivative Agreement" means without limitation,

(a)     any contract known as or referred to or which performs the function of an interest rate swap agreement, currency swap agreement, forward payment conversion agreement futures contract;

(b)     any contract providing for payments based on levels of, or changes or differences in, interest rates, currency exchange rates, or stock or other indices;

(c)     any contract to exchange cash flows or payments or series of payments;

(d)     any type of contract called, or designed to perform the function of, interest rate floors or caps, options, puts or calls, to hedge or minimize any type of financial risk, including, without limitation, payment, currency, rate or other financial risk; or

(e)     any other type of contract or arrangement that the Person entering into such contract or arrangement determines is to be used, or is intended to be used, to manage or reduce the cost of obligations, to convert any element of obligations from one form to another, to maximize or increase investment return, to minimize investment risk or to protect against any type of financial risk or uncertainty.

"Effective Date" shall have the meaning given such term in Section 4.1 hereof.

"Environment" shall mean ambient air, surface water, groundwater, soil, sediment and land.

"Environmental Condition" shall mean (i) any release or threatened release of a hazardous substance from, in, on, under, or onto the Real Property; (ii) any release or threatened release of a hazardous substance from the Real Property in, on, under, or onto any other property that results in any damages, loss, cost, expenses, or other liability; (iii) any violation of any Environmental Law relating to the manufacture, processing, distribution, transportation, storage, use, discharge, handling, emission, or disposal of Hazardous Materials or solid waste by or in connection with the operations of any Warren Company; or (iv) any release or threatened release of a Hazardous Material at a site at which hazardous substances are located which was generated, transported, or disposed of by any Warren Company.

"Environmental Laws" means all federal, regional, state, county or local laws, statutes, ordinances, decisional law, rules, regulations, codes, orders, decrees, directives and judgments relating to public health or safety, pollution, damage to or protection of the Environment, Environmental Conditions, Releases or threatened Releases of Hazardous Materials into the Environment or the use, manufacture, processing, distribution, treatment, storage, generation, disposal, transport or handling of Hazardous Materials, including but not limited to, the Federal Water Pollution Control Act, 33 U.S.C. §§ 1231-1387; the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901-6991; the Clean Air Act, 42 U.S.C. §§7401-7642; the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. §§ 9601-9675; the Toxic Substances Control Act, 15 U.S.C. §§ 2601-2629; ISRA; the Site Remediation Reform Act, P.L. 2009, c. 60 (the "SRRA"); the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-

· 23.11 et seq.; the New Jersey Water Pollution Control Act, N.J.S.A. 58:10A-1 et seq.; the New Jersey Air Pollution Control Act, N.J.S.A. 26:2C-1 et seq.; and the New Jersey Environmental Rights Act, N.J.S.A. 2A:35A-1 et seq.; and any and all rules and regulations promulgated thereunder.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

"Execution Date" shall mean April 22, 2011, the date of execution of this Agreement.

"FTC" means the Federal Trade Commission.

"GAAP" means generally accepting accounting principles in the United States, consistently applied.

"Governing Board" means the board of trustees, board of directors, board of managers or other body or Person that governs the business and affairs of any Person that is not an individual.

"Government Authorization" means any approval, consent, license, permit, registrations, CON, clearance, court order or other authorization issued, granted, given or otherwise made available by or under the authority of any Government Body or pursuant to any Legal Requirement.

"Government Body" means any:

    (a)    federal, state, county, city, township, local, municipal, foreign or other government;

    (b)    government or quasi-government authority of any nature (including any government agency, branch, department, bureau, commission, instrumentality, official or entity and any court or other tribunal); or

    (c)    body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature.

"Hazardous Materials" shall mean any substance, material or waste, whether liquid, gaseous or solid, and any pollutant or contaminant, that is infectious, toxic, hazardous, explosive, corrosive, flammable or radioactive, or that is regulated under, defined, listed or included in any Environmental Laws, including without limitation, petroleum, polychlorinated biphenyls, asbestos and asbestos containing materials and urea formaldehyde.

"Health Service" means each licensed hospital, nursing home or other subacute care facility, home health business, hospice, outpatient facility, primary or specialty physician practice, diagnostic facility or other healthcare facility or service operated or controlled by any Warren Company.

"Hill Burton Act" shall have the meaning set forth in Section 5.35.

"Hillcrest Litigation" means the legal actions known as "*InMed Investors v. WH Memorial Parkway Investors, Warren Hospital, et al.* (Superior Court of New Jersey, Warren County, Docket No, WRN-C-16022-10)", and "*Wells Fargo Bank, N.A. v. Hillcrest Medical Plaza, L.L.C, Warren Hospital, et al.* (Superior Court of New Jersey, Warren County, Docket No, F- 000468-11)" and any other legal actions, claims, counterclaims, matters or disputes respecting Hillcrest Medical Plaza, L.L.C, or any other Affiliate of Warren with respect to the property known generally as Hillcrest Medical Plaza ("HMP") and any related matters.

"HFG" means Healthcare Finance Group, Inc.

"HFG Agreement" means the Revolving Loan and Security Agreement, dated as of November 24, 2009, among the Hospital, as borrower, HFG, as agent and lender, and the other financial institutions which are a party thereto as lenders from time to time.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Intellectual Property" shall have the meaning given such term in Section 5.27 of this Agreement.

"ISRA" means the Industrial Site Recovery Act, P.L. 1993, c. 139, codified at N.J.S.A. 13:1 K-6 et. seq. and 58:10B-1 et. seq.

"Joint Commission" means the accrediting organization f/k/a/ the Joint Commission on Accreditation of Healthcare Organizations.

"Knowledge" An individual will be deemed to have Knowledge of a particular fact or other matter if: (i) that individual is actually aware of that fact or matter, or (ii) a prudent individual could be expected to discover or otherwise become aware of that fact or matter in the course of conducting a reasonably comprehensive investigation regarding the accuracy of any representation or warranty in this Agreement. A Person (other than an individual) will be deemed to have "Knowledge" of a particular fact or other matter if any individual who is serving as a director, trustee, officer or Senior Manager of such Person, has, or at any time had, Knowledge of such fact or other matter as set forth in either of clauses (i) or (ii) above. In addition to the foregoing, a Person (other than an individual) will be deemed to have "Knowledge" of a particular fact or other matter if any individual who is serving, or who has at any time after December 31, 2007 served, as a director, trustee, officer, partner, member or trustee of such Person (or in any similar capacity) has, or at any time had, Knowledge of such fact or other matter as set forth in either of clauses (i) or (ii) above.

"Leased Real Property" shall have the meaning set forth in Section 5.16(a).

"Legal Requirement" means the laws of all federal, state and local authorities, the common law, and all applicable rules, regulations and requirements of all federal, state and local commissions, boards, bureaus and agencies having jurisdiction over the operations of the St. Luke's Entities and the Warren Companies, including, without limitation, the Centers for Medicare and Medicaid Services ("CMS"), the Internal Revenue Service ("IRS"), the Office of Inspector General ("OIG") of the U.S. Department Health and Human Services ("HHS"), U.S.

Department of Labor ("DOL"), the FTC and state health agencies, including the New Jersey Department of Health and Senior Services ("NJDHSS"), the New Jersey Attorney General's Office ("AG") and any decision, injunction, judgment, order or ruling by any federal or state court, administrative agency or other Government Body or by any arbitrator.

"LOI" means that certain Non-Binding Letter of Intent, dated November 23, 2010, between Warren and St. Luke's, as extended by amendment from time to time.

"Material Adverse Change" means, as used in this Agreement, any event, change, circumstance, effect or state of facts that is, or would be reasonably likely to be, materially adverse to (i) the business, financial condition, or results of operations of Warren, taken as a whole, or (ii) the ability of Warren or the Hospital to perform its obligations under this Agreement or the other documents necessary to effect the Transaction. To the extent that misrepresentations or breaches of the representations and warranties occur that do not independently constitute a Material Adverse Change, the aggregate of all such misrepresentations or breaches will be taken into consideration in determining whether all the breaches or misrepresentations taken as a whole constitute a Material Adverse Change.

"Material Contract" means any Contract (i) under which any Warren Company has or may acquire any rights, (ii) under which any Warren Company has or may become subject to any obligation or liability or (iii) by which any Warren Company or any of the assets owned or used by it is or may become bound. For purposes of this Agreement, a Contract shall be considered a "Material Contract" only if it involves future payments or performance of services or delivery of goods or material, to or by any Warren Company, of any amount or value in excess of $10,000. Notwithstanding the foregoing, if a Contract as defined herein involves a physician, physicians or physicians' group the materiality limit shall be $0.

"New Hospital Leases" shall have the meaning set forth in the Post-Foreclosure Agreement.

"New Warren Bonds" means the New Jersey Health Care Facilities Financing Authority Revenue Bonds, Warren Hospital Obligated Group Issue, Series 2011 (Federally Tax-Exempt), which will refund all of the Warren Bonds, as further described in Schedule 7.9.

"Ordinary Course of Business" means, with respect to the applicable Person, (i) the specific action is consistent in all respects with the past practices of the Person and is taken in the ordinary course of the normal day-to-day operations of such Person, and (ii) such action is not required by any applicable Legal Requirement or the Certificate of Incorporation, Bylaws or relevant Resolutions of such Person to be authorized by the Governing Board of such Person (or by any Person or group of Persons exercising similar authority) and is not required to be specifically authorized by the parent company (if any) of such Person.

"Owned Real Property" shall have the meaning given such term in Section 5.16(a).

"Permitted Encumbrances" shall have the meaning given such term in Section 5.16(b).

7

"Person" means any individual, corporation, general or limited partnership, limited liability company, limited liability partnership, joint venture, estate, trust, association, organization, labor union or other entity or Government Body.

"Plan" shall have the meaning set forth in Section 5.30(a).

"Post-Foreclosure Agreement" means that certain Post-Foreclosure Agreement Respecting Status of Leases dated March 28, 2011 by and among the Hospital, WH Memorial Parkway Investors, L.L.C., a New Jersey limited liability company, Warren Health Care Alliance, P.C., a New Jersey corporation, Two Rivers Enterprises, Inc., a New Jersey corporation, and Wells Fargo, as lender, in the form attached hereto as Exhibit H.

"Programs" shall have the meaning given such term in Section 5.11(a).

"Real Property" shall have the meaning given such term in Section 5.16(a).

"Release" shall mean any intentional or unintentional release, discharge, burial, spill, leaking, pumping, pouring, emitting, emptying, injection, disposal or dumping into the Environment.

"Required Estoppel Certificates" shall mean Estoppel Certificates satisfactory to St. Luke's executed, as applicable, by (i) the tenant under each Tenant Lease for space of 2,000 square feet or more, or which provides for an annual rental (or total per session fees) in excess of $10,000 per annum, substantially in the form of Exhibit I-1, and (ii) the landlord under each Warren Lease, and each New Hospital Lease, substantially in the form of Exhibit I-2. Notwithstanding the foregoing, Required Estoppel Certificates shall not include Estoppel Certificates for Third Party Subtenants (as defined in the Post-Foreclosure Agreement).

"Senior Manager" means a management representative at the administrative director or manager level or above.

"St. Luke's Required Consents" shall have the meaning given such term in Section 6.2(c) hereof.

"Tax" and "Taxes" shall have the meanings given such terms in Section 5.14.

"Tax Return" and "Tax Returns" shall have the meanings given such terms in Section 5.14.

"Tenant Leases" shall have the meaning given such term in Section 5.16(d).

"Title Acquisition Date" shall have the meaning set forth in the Post-Foreclosure Agreement.

"2008A Warren Bonds" means the New Jersey Health Care Facilities Financing Authority Revenue Bonds, Warren Hospital Obligated Group Issue, Series 2008A (Federally Tax-Exempt).

8

688197.15

"2008B Warren Bonds" means the New Jersey Health Care Facilities Financing Authority Revenue Bonds, Warren Hospital Obligated Group Issue, Series 2008B (Federally Taxable).

"2005 Swap" means that certain hedging arrangement documented by that certain ISDA Master Agreement, including the Schedule thereto and the Credit Support Annex to the Schedule thereto, each dated as of May 17, 2005, and the Confirmation Reference Number AUD3R, dated May 20, 2005, each by and between Morgan Stanley Capital Services Inc. and the Hospital.

"Warren Bonds" shall mean, collectively, the 2008A Warren Bonds and the 2008B Warren Bonds.

"Warren Financial Statements" shall have the meaning given such term in Section 5.6 hereof.

"Warren Leases" shall have the meaning give such term in Section 5.16(c).

"Warren Required Consents" shall have the meaning set forth in Section 5.2(c) hereof.

"Wells Fargo" shall mean Wells Fargo Bank, N.A.

### 1.2.    Interpretation of Certain References.

As used in this Agreement, and unless the context requires otherwise:

(a)    References to Articles and Sections are references to articles and sections of this Agreement;

(b)    The terms "hereto", "herewith", "herein", "hereby", "hereunder" and derivative or similar words shall refer to this entire Agreement;

(c)    References to "include" or "including" mean including without limitation;

(d)    Each Exhibit and Schedule is incorporated in, and made a part of, this Agreement by reference;

(e)    The gender of all words herein shall include the masculine, feminine, and neuter, and the number of all words herein shall include the singular and plural; and

(f)    The terms "will" and "shall" are used interchangeably in this Agreement and the use of either term requires mandatory performance by the respective Party unless the context clearly states otherwise.

### II.    THE TRANSACTION

#### 2.1.    The Hospital Reorganization.

(a)    Substitution of Sole Member. On the Effective Date, St. Luke's Hospital shall be substituted as the sole member of the Hospital (the "Hospital Substitution"), and the

Hospital shall become a wholly owned subsidiary of St. Luke's Hospital. On the Effective Date, the Hospital Certificate of Incorporation shall be amended and restated as provided in Exhibit A, attached hereto and made part hereof.

(b)     Hospital Trustee Representation on Hospital Board After the Effective Date. The persons whose names are set forth in Schedule 2.1(b) shall be appointed as additional members of the Hospital Board of Trustees (the "Hospital Board") as of the Closing Date. On the Effective Date, the Hospital Bylaws shall be amended and restated as provided in Exhibit B attached hereto and made part hereof.

(c)     Hospital Auxiliary. The Closing of the Hospital Substitution shall not cause any merger or consolidation of the Hospital auxiliaries that are organized and existing as of the date of this Agreement. The Auxiliaries shall continue to provide services to and support the Hospital.

(d)     Subsequent Substitution of St. Luke's for St. Luke's Hospital as the Member of Hospital. Subsequent to Closing, at a time designated by St. Luke's in its sole discretion, the Parties agree that St. Luke's may cause the substitution of St. Luke's as the member of Hospital, in place of St. Luke's Hospital.

### 2.2.     The Warren Reorganization.

(a)     Substitution of Sole Member. On the Effective Date, and immediately following the Hospital Substitution, St. Luke's shall be substituted as the sole member of Warren (the "Parent Substitution"), and Warren shall become a wholly-owned subsidiary of St. Luke's. On the Effective Date, Warren's Certificate of Incorporation shall be amended and restated as provided in Exhibit C, attached hereto and made part hereof.

(b)     Warren Trustee Representation on Warren Board After the Effective Date. The members of the Warren Board of Trustees (the "Warren Board") in office on the Closing Date shall resign or be deemed to have resigned as of the Effective Date, and shall be replaced by members appointed by St. Luke's, which members shall include the then-current President of the Hospital. On the Effective Date, the Warren Bylaws shall be amended and restated as provided in Exhibit D attached hereto and made part hereof.

(c)     Warren Trustee Representation on St. Luke's and St. Luke's Hospital Boards after the Effective date. As of the Effective Date, the two Warren Trustees listed on Schedule 2.2(c) shall be appointed to the St. Luke's Board of Trustees and the St. Luke's Hospital Board of Trustees.

### 2.3.     Other Matters.

(a)     Captive Physician Entities. If requested by St. Luke's, and upon consultation with the then-current President of Warren, the physician stockholders in the Captive PCs shall terminate their agreements with each of their respective Captive PCs and shall surrender all their stockholdings to a new physician stockholder designated by St. Luke's.

10

(b)     Integration of Other Hospital Entities and Affiliates.  The Parties agree that subsequent to the Closing Date, at such time or times as designated by St. Luke's, in its sole discretion, any Warren Company or Affiliate may be merged, consolidated, assigned, transferred to, or the operations of any such Warren Company or Affiliate may be integrated with, any Affiliate or Person designated by St. Luke's.

(c)     Hospital President.  As of the Effective Date, the President of the Hospital immediately prior to Closing will remain the President of the Hospital immediately following the Closing. By reason of such designation, such Person will thereupon become a member of the St. Luke's executive management team.

(d)     The Foundation.  On the Effective Date, and immediately following the Parent Substitution, the Hospital shall be substituted as the sole member of the Foundation, and the Foundation shall become a wholly-owned subsidiary of the Hospital. On the Effective Date, the Foundation's Certificate of Incorporation and Bylaws shall be amended and restated as provided in Exhibit E and Exhibit F, respectively, attached hereto and made a part hereof. The members of the Foundation Board of Trustees on the date immediately prior to the Closing Date shall continue to serve in such capacity following the Closing, for such term and in accordance with the other terms and conditions of the Bylaws and Certificate of Incorporation of the Foundation, as amended and supplemented in accordance with this Agreement. As set forth in such Foundation Bylaws and Certificate of Incorporation, fund balances, cash, securities and all other forms of property representing or resulting from all the charitable donations and the earnings of the Foundation, received, pledged or conveyed at any time, whether before the Closing or after the Closing, shall be used to support the local services and facilities of the Hospital or any other activity or investment of the Foundation in existence as of the Closing Date. St. Luke's will assist in coordinating annual fundraising, major giving and capital campaigns by the Foundation.

## III.     FINANCIAL AND OPERATIONAL COVENANTS OF THE PARTIES

### 3.1.     Capital Contribution to Warren or the Hospital.

(a)     St. Luke's and/or St. Luke's Hospital shall contribute to Warren or the Hospital $25 million (the "Contribution") in accordance with Schedule 3.1.

(b)     Notwithstanding Section 3.1(a), if, as a result of the Plan to Pay Creditors set forth on Schedule 10.6, the satisfaction prior to Closing of other obligations of the Warren Entities set forth on Schedule 3.1 or otherwise, the entire Contribution is not necessary to satisfy the amounts described on Schedule 3.1 following the headings "USE OF FUNDS AT CLOSING" and "USE OF FUNDS AT OR FOLLOWING CLOSING" set forth therein (the "Contribution Balance"), the St. Luke's Board of Trustees and the Hospital Board shall mutually determine how any such Contribution Balance shall be used post-Closing.

### 3.2.     Continuation of the Hospital as Full Service Acute Care Hospital.

The Parties agree that, subject to Section 3.4 below, the Hospital will be maintained as a full service acute care hospital for a minimum period of ten (10) years following the Closing Date. The Parties will endeavor to grow existing and new service lines at the Hospital including,

11

688197.15

without limitation, the growth of Hospital's general surgery, orthopedic and geriatric programs, subject to the needs of the community and the financial, budget, and other resources of the Hospital as determined by St. Luke's with consultation by the Hospital Board. To the extent permitted by State regulators, St. Luke's will endeavor to re-establish a full service OB/GYN program at Hospital, subject to the needs of the community and the financial, budget, and other resources of the Hospital as determined by St. Luke's with consultation by the Hospital Board.

### 3.3.  Hospital Goals and Objectives.

The Parties believe the Transaction will result in the realization of certain benefits for the Hospital which may include but are not limited to: ensuring high quality, affordable patient care for the communities Warren serves; reducing costs by sharing services and expertise in areas such as information technology, resource management, quality improvement and patient satisfaction; improving clinical communications and patient outcomes; and, facilitating opportunities for patients in the communities Warren serves to receive high quality medical services across an integrated continuum of care. Accordingly, the Parties have created a list of goals and objectives in Schedule 3.3 based on their current expectations. The Parties further understand that the goals and objectives are dependent upon various internal and external circumstances and are not intended to be legally binding obligations by or upon either Party.

### 3.4.  Hospital Clinical Services.

It is the intent of the Parties to continue to maintain and expand clinical services provided at the Hospital prior to the Effective Date subject to the needs of the community and the financial, budget, and other resources of the Hospital. The Parties acknowledge and agree that the clinical services and their treatment modalities, and the demands of payors and patients will change and evolve over time, which may make some clinical services currently provided by the Hospital obsolescent or financially prohibitive in the future. St. Luke's and the Hospital will therefore need to adapt to these changing circumstances over time, and the Parties recognize and agree that St. Luke's will have the flexibility to determine, in its sole discretion with consultation by the Hospital Board, which clinical services should continue at the Hospital from time to time in the context of this environment, subject to the requirement in Section 3.2 that the Hospital remain an acute care hospital for a minimum period of ten (10) years following the Closing Date. St. Luke's shall ensure the Hospital will continue to provide charity care services consistent with the Hospital's charitable mission.

### 3.5.  Integration and Collaboration.

The Parties shall: (a) collaborate with respect to administrative support functions in order to achieve costs savings and enhance services for purposes of Integration; (b) pursue information technology network development initiatives at the Hospital; and (c) work together to find opportunities to meet the health care needs in Warren's community, including the introduction of various tertiary, specialty and subspecialty services, and to identify efficiencies and quality improvement opportunities. Warren's administrative leadership shall participate in the strategic leadership initiatives of St. Luke's, including participation by the President and CEO of Warren in President's Council's meetings of St. Luke's.

### 3.6. Allocation of Overhead Expenses.

St. Luke's will use an appropriate methodology after the Closing Date for charging the Warren Entities for those services that are centrally provided by St. Luke's with a goal of having those allocated overhead costs not exceed the current costs of the Warren Entities, as adjusted appropriately for inflation and other post-Closing changes. The Parties will use reasonable efforts prior to Closing to identify which services currently provided by the Hospital will be centralized and provided by St. Luke's and the allocation of those expenses and other overhead expenses.

### 3.7. Affiliations.

St. Luke's will maintain Warren's current clinical and educational affiliations, unless services provided are available within St. Luke's system or such affiliations are inconsistent with St. Luke's strategic initiatives.

### 3.8. Medical School Relationships.

St. Luke's supports Warren's development of strong medical school affiliations, and Warren's participation in medical student and resident education on the Hospital campus.

### 3.9. Medical Staff.

Subsequent to the Closing, the medical staff of the Hospital shall continue to operate separately from the medical staffs at other St. Luke's hospitals, unless otherwise agreed upon by the Hospital Board and the applicable St. Luke's hospital.

### 3.10. Brand and Image.

St. Luke's branding strategy focuses on promoting and marketing its affiliated hospitals in their local service areas, with St. Luke's in a supporting umbrella role. St. Luke's agrees to implement its current branding strategy for the Hospital, subject to any changes St. Luke's may implement across the St. Luke's system in the future.

## IV. CLOSING

### 4.1. Closing and Effective Date.

The closing contemplated by this Agreement (the "Closing") shall take place at 10:00 a.m. Philadelphia time on such date as shall be mutually determined by the Parties, to occur no later than ten (10) days after the satisfaction (or waiver by the applicable Party in its sole discretion) of all conditions to Closing set forth herein (the "Closing Date"); provided, however, that, subject to the satisfaction (or waiver by the applicable Party in its sole discretion) of all other conditions to Closing set forth herein, if the transactions contemplated by the Post-Foreclosure Agreement are completed, then the Closing Date shall occur within thirty (30) days of the Title Acquisition Date. The Closing will be effective as of 12:01 a.m. Philadelphia time on the day following the Closing Date (the "Effective Date"). The Closing shall take place at the

offices of St. Luke's legal counsel, Saul Ewing LLP, located at Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102-2186.

**4.2.** **Closing Deliveries.**

On the Closing Date, the Parties shall provide the following:

(a) Warren Entity Deliverables. The Warren Entities shall deliver, or cause to be delivered, to the St. Luke's Entities, the following:

(i) Amended and Restated Certificates of Incorporation for Hospital Warren and the Foundation substantially in the forms attached hereto as Exhibit A, Exhibit C, and Exhibit E, respectively, in accordance with Sections 2.1(a), 2.2(a) and 2.3(d);

(ii) Amended and Restated Bylaws for the Hospital substantially in the form attached hereto as Exhibit B, in accordance with Section 2.1(b), Amended and Restated Bylaws for Warren substantially in the form attached hereto as Exhibit D, in accordance with Section 2.2(b), and Amended and Restated Bylaws for the Foundation substantially in the form attached hereto as Exhibit F, in accordance with Section 2.3(d);

(iii) All Warren Required Consents necessary to consummate the Transaction;

(iv) All Required Estoppel Certificates;

(v) The Church Parking Lease Amendment;

(vi) Updated versions of the disclosure schedules as of the Closing Date;

(vii) Copies of resolutions duly adopted by the Governing Boards of each of the Warren Entities authorizing and approving their performance of the Transaction and the execution and delivery of this Agreement and the documents described herein, certified as true and of full force and effect as of the Closing Date by an appropriate officer of each of the Warren Entities;

(viii) A certificate by an officer of each of the Warren Entities certifying that its respective representations and warranties contained in this Agreement are true and correct in all material respects on and as of the Closing Date and that each and all of the terms, covenants, obligations and agreements to be completed with or performed by them on or before the Closing Date have been complied with and performed in all material respects;

(ix) If requested by St. Luke's pursuant to Section 2.3(a) hereof, the termination of each Shareholder Control Agreement between each Captive PC's shareholder(s) and their respective PCs;

14

(x)     The opinion of counsel for the Warren Entities and the opinion of counsel for Warren Risk Retention Group, Inc., each as referenced in Section 10.12;

(xi)     Documentation satisfactory in St. Luke's sole discretion evidencing the binding effect of the Plan of Restructuring contemplated under Section 10.4 hereof;

(xii)     Documentation satisfactory in St. Luke's sole discretion evidencing the binding effect of the Plan to Pay Creditors set forth on Schedule 10.6;

(xiii)     A fully executed copy of the Post-Foreclosure Agreement and copies of all other documentation contemplated by or required in connection with Section 10.5 hereof which shall be sufficient, in St. Luke's sole discretion, to evidence performance and or compliance with Section 10.5;

(xiv)     A letter from the New Jersey Attorney General approving the Transaction under CHAPA;

(xv)     A nonappealable order of the New Jersey Superior Court approving the Transaction under CHAPA;

(xvi)     Revised employment agreements for those Persons whose names appear on Schedule 4.2(a)(xvi), with terms acceptable to St. Luke's ("Executive Officer Employment Agreements"); and

(xvii)     All other agreements, instruments and documents as are reasonably necessary to consummate and evidence the Transaction as of the Closing Date shall have been delivered and be in full force and effect.

(b)     St. Luke's Entity Deliverables.  The St. Luke's Entities shall deliver, or cause to be delivered, to the Warren Entities, the following:

(i)     All St. Luke's Required Consents necessary to consummate the Transaction;

(ii)     Copies of resolutions duly adopted by the Governing Boards of each of the St. Luke's Entities authorizing and approving their performance of the Transaction and the execution and delivery of this Agreement and the documents described herein, certified as true and of full force and effect as of the Closing Date by an appropriate officer of each of the St. Luke's Entities;

(iii)     A certificate by an officer of each of the St. Luke's Entities certifying that its respective representations and warranties contained in this Agreement are true and correct in all material respects on and as of the Closing Date and that each and all of the terms, covenants, obligations and agreements to

be completed with or performed by them on or before the Closing Date have been complied with and performed in all material respects;

(iv)    A letter from the New Jersey Department of Health and Senior Services granting a waiver from the requirement for a CON for the Transaction, or CON approval for the Transaction; and,

(v)    All other agreements, instruments and documents as are reasonably necessary to consummate and evidence the Transaction as of the Closing Date shall have been delivered and be in full force and effect.

## V.    REPRESENTATIONS AND WARRANTIES OF THE WARREN ENTITIES

Except as otherwise specifically set forth hereafter, each of the Warren Entities, on behalf of itself and, where indicated, the Warren Companies, hereby jointly and severally represent and warrant to the St. Luke's Entities that the following facts and circumstances are as of the date hereof and, except as contemplated hereby, on the Closing Date shall be, true and correct:

### 5.1.    Organization.

Each of the Warren Entities and the Foundation is a nonprofit corporation duly organized, validly existing and in good standing under the laws of the State of New Jersey. Two Rivers is a corporation (for profit) duly organized, validly existing and in good standing under the laws of the State of New Jersey. Each of the Corporation's PCs is a professional services corporation (for profit) duly organized, validly existing and in good standing under the laws of the State of New Jersey. WPAPA is a professional corporation duly organized and subsisting under the laws of the Commonwealth of Pennsylvania.

### 5.2.    Corporate Powers; Consents.

(a)    Each Warren Entity has the requisite right, power and authority to execute and deliver this Agreement and all other agreements and instruments to be executed in connection with the Transaction, and to perform its respective obligations thereunder.

(b)    The execution, delivery and performance of this Agreement by the Warren Entities and all other agreements ancillary hereto to which any of them is a party and the consummation of the Transaction by the Warren Entities shall not:

(i)    Contravene any Legal Requirement or the terms of any Warren Entity's Certificate of Incorporation, Bylaws or other organizational documents or any resolution adopted by its respective Governing Boards or members;

(ii)    Contravene, conflict with or result in a violation of any of the terms or requirements of, or give any Government Body the right to revoke, withdraw, suspend, cancel, terminate or modify, any material Government Authorization that is held by any Warren Company or that otherwise materially relates to the business of, or any of the assets owned or used by, any Warren Company;

16

(iii)  Cause any Warren Company, or any St. Luke's Entity, to become subject to, or to become liable for the payment of, any tax;

(iv)  Cause any of the assets owned by any Warren Company to be reassessed or revalued by any taxing authority or other Government Body;

(v)  Contravene, conflict with or result in a violation or breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate or modify, any Material Contract; or

(vi)  Result in the imposition or creation of any material lien or encumbrance upon or with respect to any of the assets owned or used by any Warren Company.

(c)  Except for those Consents set forth on <u>Schedule 5.2</u> (the "Warren Required Consents"), none of the Warren Companies is or will be required to provide any notice to, file with, or obtain any Consent from any Government Body or Person in connection with the execution or delivery of this Agreement or the performance of the Transaction.

### 5.3.  Tax-Exempt Status.

Each of Warren, the Hospital, and the Foundation is an organization described in Section 501(c)(3) of the Code and is exempt from federal income taxation under Section 501(a) of the Code. No such entity is a private foundation as defined in Section 509(a) of the Code. To the Knowledge of Warren, the Hospital, and the Foundation, no event has occurred and no condition exists which might jeopardize the existing tax-exempt status of any such entity.

### 5.4.  Membership and Other Interests and Arrangements.

The membership, ownership and other interests and rights of the Warren Companies being transferred or assigned to or acquired by the St. Luke's Entities pursuant to this Agreement are, and on the Closing Date shall be, owned and held by such Warren Companies as set forth on <u>Exhibit 1</u> free and clear of any charge, claim, condition, equitable interest, lien, encumbrance, pledge, security interest, option, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership, except, in each case, as otherwise expressly set forth on <u>Schedule 5.4</u>. There are no contracts or commitments relating to the issuance, sale or transfer of any membership interests, equity securities or interests of any Warren Company. Except for the 2005 Swap, there are no other Derivative Agreements to which any Warren Company is a party.

### 5.5.  Binding Effect.

This Agreement and all other agreements entered into in connection herewith to which the Warren Entities are or will become a party are and will as of the date hereof and the Closing Date constitute the valid and legally binding obligation of each Warren Entity and are enforceable against each such Warren Entity in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy

17

688191.13

or other laws affecting creditors' rights generally and except as enforceability may be subject to principles of equity. The execution and delivery of this Agreement and all other agreements entered into in connection herewith to which the Warren Entities are or will become a party have been duly authorized by all necessary corporate, partnership, limited liability company or other entity action on the part of the applicable Warren Entity and no further authorization or consent of the Governing Board of such Warren Entity is or shall be necessary.

### 5.6.   Financial Statements.

(a)   Warren, on behalf of itself and each of the Warren Companies, has delivered, or shall deliver prior to Closing, to the St. Luke's Entities copies of the following financial statements with respect to each of the Warren Companies (collectively, the "Warren Financial Statements"):

(i)   Consolidated balance sheets, statements of operations and changes in net assets and statements of cash flows of the Warren Companies for the years ended December 31, 2008, 2009, and 2010, together with the notes thereto and the audit report thereon by Warren's independent auditors; and

(ii)   Unaudited consolidated balance sheets, statements of operations and changes in net assets and statements of cash flows of the Warren Companies as of March 31, 2011, which shall be updated and provided for each month of 2011 until four weeks before Closing, at which time said reports shall be provided once each week until Closing.

(b)   The Warren Financial Statements are true, complete and accurate and fairly present the financial condition and results of operations at the respective dates thereof and for the periods therein referenced, and have been prepared in accordance with GAAP, subject in the case of unaudited interim financial statements to the absence of notes and to normal, recurring year-end adjustments and accruals consistent with past practices, and the Warren Financial Statements reflect the consistent application of such accounting principles throughout the periods involved, except as otherwise disclosed therein. The Warren Entities have heretofore provided to the St. Luke's Entities copies of all annual management letters with respect to the Warren Companies from their independent certified accountants for each of the last three (3) fiscal years.

(c)   All accounts receivable of the Warren Companies that are reflected on the Warren Financial Statements (the "Accounts Receivable") represent obligations reasonably characterized as enforceable arising from services actually performed or sales actually made in the Ordinary Course of Business and are current and collectible net of the respective reserves shown on the Warren Financial Statements. There is no contest, claim or right of setoff, other than refunds in the Ordinary Course of Business or other matters for which adequate reserves have been established, under any contract with any obligor of an Accounts Receivable relating to the amount or validity of such Accounts Receivable.

(d)     Except as set forth in the Warren Financial Statements, or as otherwise specified in Schedule 5.6, there are no contingent or other liabilities or obligations which have, or with reasonable foreseeability may cause, a Material Adverse Change.

### 5.7.    Books and Records.

The books of account, minute books, membership and stock record books, and other records of the Warren Companies, which have all been made available to the St. Luke's Entities, are complete and correct in all material respects and have been maintained in accordance with sound business practices in all material respects, including the maintenance of an adequate system of internal controls. The minute books of the Warren Companies contain materially accurate and complete records of all meetings held of, and corporate action taken by, the members or shareholders, as the case may be, the Governing Boards, and committees of the Governing Boards of the Warren Companies, and no meeting of any such members, shareholders, Governing Board or committee has been held for which minutes have not been prepared and are not contained in such minute books. All of such books and records are in the possession of Warren or the applicable Warren Company.

### 5.8.    Licenses, Permits and Other Government Authorizations.

The Hospital is duly licensed by the New Jersey Department of Health and Senior Services as a general acute care hospital with 214 inpatient beds. The Hospital and each of the other Warren Companies currently maintain all licenses, permits and other Government Authorizations necessary or required by law to conduct their respective operations as currently conducted. Attached hereto as Schedule 5.8 is an accurate list and summary description of all such Government Authorizations owned or held by each Warren Company relating to the ownership, development or operations of its respective businesses, all of which are in good standing according to Certificates of Good Standing issued on or about the date of execution of this Agreement, and not subject to meritorious challenge. Each Warren Company is, and at all times since January 1, 2006 has been, in material compliance with all of the terms and requirements of each such Government Authorization. Except as otherwise set forth on Schedule 5.8, no Warren Company has received, at any time since January 1, 2006, any notice or other communication (whether oral or written) from any Government Body or any other Person regarding (a) any actual, alleged, possible or potential violation of or failure to comply with any term or requirement of any Government Authorization, or (b) any actual, proposed, possible or potential revocation, withdrawal, suspension, cancellation, termination of, or modification to any Government Authorization. All applications required to have been filed for the renewal of each material Government Authorization listed or required to be listed on Schedule 5.8 have been duly filed on a timely basis with the appropriate Government Bodies, and all other filings required to have been made with respect to such material Government Authorizations have been duly made on a timely basis with the appropriate Government Bodies. There are no provisions in, or agreements relating to, any such Government Authorizations which would preclude or limit any Warren Company from conducting its respective operations or providing the Health Services. The Warren Entities have delivered to the St. Luke's Entities true, complete and correct copies of the most recent state licensing reports, lists of deficiencies, and most recent statements of condition and plans of correction, fire marshal surveys and related lists of deficiencies pertaining to the Warren Companies, as set forth on Schedule 5.8.

### 5.9. Certificates of Need.

Except as set forth on Schedule 5.9, no application for any Certificate of Need ("CON") has been made by any Warren Company with the New Jersey Department of Health and Senior Services which is currently pending or open, and no application for any CON filed by any Warren Company within the past three (3) years has ultimately been denied or withdrawn. Except as set forth on Schedule 5.9, no Warren Company has approved applications for a CON which relate to projects not yet completed.

### 5.10. Legal and Regulatory Compliance.

Except as set forth on Schedule 5.10 hereto:

(a)    Each Warren Company is in compliance with all Legal Requirements applicable to it or the operation of its business;

(b)    Each Warren Company has timely filed all material reports, data and other information required to be filed with any Government Body;

(c)    No event has occurred or circumstance exists that (with or without notice or lapse of time) (i) may constitute or result in a violation by any Warren Company of, or a failure on the part of any Warren Company to comply in any respect with, any Legal Requirement, or (ii) may give rise to any obligation on the part of any Warren Company to undertake, or to bear all or any portion of the cost of, any remedial action of any nature;

(d)    No Warren Company has received, at any time since January 1, 2006, any notice or other communication (whether oral or written) from any Government Body or any other Person regarding (i) any actual, alleged, possible or potential violation of, or failure to comply with, any Legal Requirement, or (ii) any actual, alleged, possible or potential obligation on the part of any Warren Company to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

### 5.11. Medicare Participation; Cost Reports; Accreditation, Third Party Insurance.

(a)    Each Warren Company that operates or provides any Health Services is duly qualified for participation in the Medicare, Medicaid and the CHAMPUS/ TRICARE Programs ("Programs"), has a current and valid provider agreement with such Programs and is fully eligible to receive payment under Titles XVIII and XIX of the Social Security Act with respect to such Programs. Each Warren Company providing Health Services is certified as a provider under the Programs, is in compliance with the conditions of participation in the Programs and has received all approvals or qualifications necessary for capital reimbursement for its services under such Programs. Except as otherwise disclosed on Schedule 5.11(a), there is not pending nor, to the Knowledge of any Warren Entity, threatened, any proceeding or investigation under or relating to the Programs or any other government health insurance program involving the Hospital or any other Warren Company providing a Health Service.

(b)    All cost reports relating to the Hospital and any other Warren Companies providing Health Services for fiscal years through December 31, 2009 have been filed and are

complete and correct in all material respects. The cost reports were filed when due and, such reports do not claim, and, to the Knowledge of any Warren Entity, no Warren Company has received, reimbursement in excess of the amount provided by law or any applicable agreement. Schedule 5.11(b) hereto indicates the status of any cost reports that have not been audited and finally settled and a brief description of any and all notices of program reimbursement, proposed or pending audit adjustments, disallowances, appeals of disallowances, and any and all other unresolved claims or disputes in respect of such cost reports. True and correct copies of all such reports and notices for the three (3) most recent fiscal years have been provided by the Warren Entities to the St. Luke's Entities.

(c)     Except as set forth on Schedule 5.11(c), there are no claims, actions or appeals pending (and no Warren Company has filed any claims or reports which should result in any such claim, actions or appeals) before any commission, board or agency, including without limitation, any intermediary or carrier, the Provider Reimbursement Board or Centers for Medicare and Medicaid Services ("CMS"), with respect to any state or federal Medicare or Medicaid cost reports or claims filed by any Warren Company on or before the date hereof, or any disallowances by any commission, board or agency in connection with any audit of such cost reports.

(d)     Except as set forth on Schedule 5.11(d), since January 1, 2006, all billing and collection practices of the Warren Companies with respect to all Programs and Program patients have been in material compliance with all applicable Legal Requirements and policies of such Programs, and no Warren Company has billed or received any payment or reimbursement in excess of amounts allowed by law. Neither any Warren Company nor any of its officers, directors, trustees or managing employees is excluded from participation in the Programs; nor is any such exclusion threatened. No program integrity review related to the Hospital or any other Warren Company providing a Health Service or the operations thereof has been conducted by any commission, board, agency or contractor in connection with the Programs or any other government health insurance program, and no such reviews are scheduled, pending or threatened against or affecting any Warren Company. In addition, except as set forth on Schedule 5.11(d), since January 1, 2006, all billing and collection practices of the Warren Companies with respect to all third party payors including, but not limited to private insurance companies, and their patients, and private pay patients ("Private Payors"), have been in material compliance with all applicable Legal Requirements and policies of such Private Payors, and no Warren Company has billed or received any payment or reimbursement in excess of amounts allowed by law or by contract. To the Knowledge of any Warren Entity, no *qui tam* action or similar action is pending or threatened against any Warren Company or its officers, directors, employees or agents.

(e)     Except as set forth in Schedule 5.11(e), the Hospital and each other Warren Company required to be accredited by the Joint Commission is duly accredited with no contingencies by the Joint Commission for a three (3) year period commencing on the date of its last accreditation. The Warren Entities have delivered to St. Luke's true and complete copies of the most recent Joint Commission accreditation survey reports and deficiency lists, if any, and the most recent statements of conditions and plans of correction with respect to each applicable Warren Company.

688197.15

(f)     Except as set forth on Schedule 5.11(f), all policies and procedures required by the Joint Commission, any other accrediting agency or Government Body with respect to any Warren Company have been properly approved and are currently in effect.

## 5.12. Litigation or Proceedings.

Except for the Hillcrest Litigation and to the extent set forth on Schedule 5.12, there are no (a) claims, actions, suits, charges, hearings, arbitrations, mediations, or other proceedings or investigations (whether civil, criminal or administrative) pending by or against, or, to the Knowledge of any Warren Entity, threatened against or affecting, any Warren Company, or its officers, directors, trustees or employees, at law or in equity; or (b) subpoenas, search warrants, civil investigative demands, contact letters or telephone or personal contacts by for from any federal, state or local enforcement agency or Government Body pending, or to the Knowledge of the Warren Entities, threatened against any Warren Company or its officers, directors, trustees or employees. The Warren Entities have delivered to St. Luke's complete, accurate and true descriptions of each item/exception listed on Schedule 5.12. To the Knowledge of each Warren Entity, it is not in violation of or in default with respect to any order, writ, injunction, or decree known to have been served upon it by any Government Body.

## 5.13. Compliance Program.

The Warren Companies have maintained a compliance program since at least April 1, 2003 and have provided or made available to the St. Luke's Entities a copy of all their current compliance program materials including all program descriptions, compliance officer and committee descriptions, ethics and risk area policy materials, training and education materials, auditing and monitoring protocols, reporting mechanisms and disciplinary policies. Except as set forth in Section 13.1(b) hereof and on Schedule 5.13, no Warren Company (a) is a party to a Corporate Integrity Agreement with the OIG, (b) has any reporting obligations pursuant to any settlement agreement entered into with any Government Body, or (c) has, since January 1, 2006, received any complaints from Warren Company employees, independent contractors, vendors, physicians or any other Person that would reasonably lead a reasonable person to believe that any Warren Company has violated any law or regulation. For purposes of this Agreement, the term "compliance program" refers to provider programs of the type described in the compliance guidance published by the OIG.

## 5.14. Taxes.

(a)     Except as disclosed on Schedule 5.14(a), all returns and reports including income, franchise, sales and use, exercise, property, gross receipts, payroll and withholding tax returns and information returns (all such returns and reports herein referred to collectively as "Tax Returns" or singularly as "Tax Return") of or relating to any federal, state or local tax (all, together with any penalties, additions to tax, fines and interest thereon or related thereto, herein referred to collectively as "Taxes" or singularly as a "Tax") that are required to be filed (taking into account all extensions) on or before the Closing Date for, by, on behalf of, or with respect to the Warren Companies have been or will be timely filed with the appropriate federal, state and local authorities on or before the Closing Date, and all Taxes shown to be due and payable on such Tax Returns have been or will be timely paid in full. All Tax Returns referred to in this

22

Section 5.14 are and will be as of the Closing Date true, correct and complete in all material respects and in compliance in all material respects with the laws, rules and regulations applicable to such Tax Returns.

(b)     Except as disclosed on Schedule 5.14(b), none of the Warren Companies is (i) currently under audit by any taxing authority or has received notice that any such audit shall be commenced; (ii) a party to any action or proceeding by a Government Body for the assessment or collection of Taxes which may adversely affect the operations or assets thereof, and (iii) no such claim against any of the Warren Companies for additional Taxes, penalties or interest is pending or threatened.

(c)     No Warren Company is a party to any agreement with any Government Body pursuant to which any Warren Company makes payments or provides services in lieu of the payment of taxes.

(d)     The Warren Entities have provided, or shall provide prior to Closing, to the St. Luke's Entities true and correct copies of the Warren Companies' federal, state and local income Tax Returns for each of the three (3) fiscal years ended December 31, 2010, 2009 and 2008.

(e)     Except as disclosed on Schedule 5.14(e), there are no state or local taxes, including transfer taxes, on real or personal property, or payments in lieu of taxes, due and payable with respect to any of the Warren Companies that are the subject of the Transaction.

### 5.15.   Bond Debt and Other Financial Obligations.

Set forth on Schedule 5.15 is a list of all outstanding taxable bond debt, tax-exempt bond debt and other financial obligations greater than $2500 (including, without limitation, any Derivative Agreements), issued for or incurred by or on behalf of any Warren Company, and:

(a)     Except as set forth as Schedule 5.15(a), no Warren Company is in violation of any of the terms and conditions of any document evidencing indebtedness, and no event or condition exists which would or could, with the passage of time, constitute an event of default under any such documents.

(b)     The Transaction shall not cause or result in a default or event of default on any outstanding indebtedness of any Warren Company.

(c)     All approvals that are required to be obtained to effect the Hospital Substitution and the Parent Substitution have been or shall be obtained prior to Closing. Such approvals are listed on the attached Schedule 5.15(c).

(d)     No Warren Entity has Knowledge of any event or condition that has occurred or exists which would or could adversely affect the tax-exempt status under federal law of the interest payable on any tax-exempt obligations issued for or benefiting any Warren Company, and no action is pending or threatened which challenges the tax-exempt status under federal law of the interest payable on any tax-exempt obligations issued for or benefiting any

Warren Company.    None of the Warren Company debt has been the subject of an IRS examination.

(e)    Each Warren Company has made or caused to be made any arbitrage rebate payments to the United States on the dates and in the amounts required by Section 148(f) of the Code with respect to the proceeds of all tax-exempt obligations issued for or benefiting any Warren Company.

(f)    Between the date hereof and the Closing Date, no Warren Company shall take any action or fail to act if such action or failure to act would adversely affect the tax-exempt status under federal law of the interest payable on any tax-exempt bonds issued for or benefiting any Warren Company, or would or could, with the passage of time, constitute an event of default with respect to any loan documents to which any Warren Company is a party.

(g)    Except as set forth on Schedule 5.15(g), no Warren Company has entered into any lease, management contract, service agreement, or other similar arrangement with an entity or person which would or could be considered a private use of facilities financed with the proceeds of tax-exempt bonds.  Between the date hereof and the Closing Date, no Warren Company shall enter into any lease, management contract, service agreement, or other similar arrangement with an entity or person which would be considered a private use of facilities financed with the proceeds of tax-exempt bonds.

(h)    All "continuing disclosure" filings required to have been made in connection with any Warren Company's bond or other financing arrangements have been made.

### 5.16.   Real Property.

(a)    The Warren Company listed as the owner of any real property on Schedule 5.16(a) hereof owns or holds the valid fee or leasehold title to all real property as described thereon, together with all buildings, improvements and fixtures thereon and all appurtenances and rights thereto (the "Real Property").  Schedule 5.16(a) sets forth which of the properties listed thereon are owned in fee by a Warren Company (the "Owned Real Property") and those that are leased by a Warren Company as tenant (the "Leased Real Property"), including, in the case of Leased Real Property, the name of the landlord, whether the landlord is an affiliate, a description of the leased space, the current expiration date, any renewal options, and whether the lease will be terminated pursuant to Section 10.5.  The Real Property constitutes all real property used by the Warren Companies in the conduct of their respective operations.

(b)    With respect to the Owned Real Property, (i) the Warren Company listed on Schedule 5.16(a) has good and marketable title to such Owned Real Property and to all buildings, structures and other improvements thereon, and (ii) such Owned Real Property will as of Closing be free and clear of all liens, claims and encumbrances, subject only to (i) the mortgages listed in Schedule 5.16(b); (ii) current taxes not yet due and payable; (iii) the Tenant Leases (as defined in Subsection 5.16(d) below); and (iv) easements, restrictions and other matters of record that are not reasonably expected to interfere with the continued use of the Real Property in a manner consistent with its current use (collectively, the "Permitted Encumbrances").

24

(c)     With respect to the Leased Real Property and the leases or subleases thereof (the "Warren Leases"), (i) the Warren Company listed on Schedule 5.16(a) as tenant or subtenant thereof has a good and marketable leasehold interest in such Leased Real Property pursuant to the applicable Warren Lease, free and clear of all liens, claims and encumbrances (although subject to any mortgages imposed upon the fee by the landlord thereof), (ii) each such Warren Lease is in full force and effect and neither the Warren Company nor the landlord thereunder is in breach or default or has repudiated any material term thereof, and (iii) except as set forth in Section 10.5, neither this Agreement nor the consummation of the Transaction will constitute a violation or breach of any of the Warren Leases or permit any landlord thereunder to terminate any Warren Lease.

(d)     Schedule 5.16(d) lists each lease, sublease, license or other agreement pursuant to which any Person other than a Warren Company occupies any, or any portion of, any Real Property (the "Tenant Leases"), including a description of the Person, the premises, the applicable lease documents, the rent, current expiration date of the term, and any renewal options. Other than Warren Companies and the Persons listed in Schedule 5.16(d), no Person is in possession of, occupies or uses any, or any portion of, the Real Property. Except as set forth in Schedule 5.16(d), each such Tenant Lease is in full force and effect and neither the Warren Company, as landlord or primary tenant, nor the tenant or subtenant thereunder is in breach or default or has repudiated any material term thereof.

(e)     Except as disclosed on Schedule 5.16(e), the buildings, structures and improvements standing on the Real Property and appurtenances thereto, including without limitation, the plumbing, electrical, mechanical, heating, ventilation and air conditioning systems are in a state of good condition and repair, are structurally sound, and none are in need of maintenance or repair except for ordinary, routine maintenance.

(f)     Except as otherwise set forth on Schedule 5.16(f):

(i)     No Warren Company has received notice of a violation of any applicable ordinance or other law, order, regulation or requirement, or has received any notice of condemnation, lien, assessment or the like (other than real estate tax bills not yet due and payable), relating to any part of the Real Property or the operation thereof, including without limitation, the Americans with Disabilities Act of 1990, as amended;

(ii)    There is not existing, or to the Knowledge of any Warren Entity, presently proposed, any condemnation or similar action, or zoning action or proceeding, or foreclosure with respect to any portion of the Real Property;

(iii)   All utilities, facilities and other services required by law or necessary for the operation of the Real Property are installed and connected and providing service pursuant to valid permits and no notice has been received by any Warren Company regarding the termination or material impairment of any such service.

(iv)     There is not existing, nor to the Knowledge of any Warren Entity, presently proposed, any moratorium or similar impediment to land development, building construction, or hook-up to usage of water or sewer or other utility services that could materially and adversely affect the use of the Real Property as it is currently being utilized;

(v)     The Real Property and the operations conducted thereon are in compliance with all applicable zoning ordinances, current local building codes and ordinance and all current fire codes and current life and safety codes of all authorities exercising jurisdiction over the ownership or operation of the Real Property. No Warren Company has received notice that any facility used in any Health Service is in material violation of local building codes, fire codes, life and safety codes, ordinances or zoning laws, and the consummation of the Transaction set forth herein will not result in a material violation of any applicable zoning ordinance or the termination of any applicable zoning variance now existing and, if the improvements on the Real Property are damaged or destroyed subsequent to Closing, the repair or replacement of same to the condition existing immediately prior to Closing will not materially violate applicable zoning ordinances (assuming there has been no change in such zoning ordinances subsequent to closing);

(vi)     No Warren Company has received notice that it has failed to obtain any license, permit, approval, certificate or other authorizations required by applicable statutes, laws, ordinances or regulations for the use and occupancy of the Real Property; and

(vii)     No part of the Real Property contains, is located within or abuts any flood plain, navigable water or other body of water, tideland, wetland, marshland or any other area which is subject to special state, federal or municipal regulation, control or protection.

**5.17.   Other Property; Title.**

Except as disclosed on Schedule 5.17 or any other schedule to this Agreement, each Warren Company owns and holds, and as of the Closing Date shall own and hold, good and marketable title to all owned tangible assets, real, personal or mixed, and valid title to all owned intangible assets and contract rights employed in the operation of the businesses of the Warren Companies or located on the Real Property, which title and rights are not, and as of the Closing Date shall not be, subject to or encumbered by any mortgage, lien, pledge, claim, security interest, conditional sales agreement, right of first refusal, option, restriction, liability, encumbrance, charge or defect. Except as disclosed on Schedule 5.17, no other Company owns or holds any property, tangible or intangible, contract rights, licenses, permits or the like, that are used or useful in the operations of the Warren Companies.

**5.18. Environmental Matters.**

Except as disclosed on Schedule 5.18, the Warren Entities, on behalf of themselves and the Warren Companies, represent and warrant to the following:

(i) Prior to Closing, the Warren Companies are and have been in compliance in all material respects with all applicable Environmental Laws.

(ii) There are no Environmental Conditions existing on or resulting from the respective operation by the Warren Companies of the Real Property or the Leased Real Property that may give rise to liabilities under Environmental Laws, whether on-site or off-site.

(iii) All notices, permits, licenses or to the Knowledge of any Warren Company authorizations (collectively, "Authorizations") required to be obtained or filed by any Warren Company pursuant to any applicable Environmental Laws in connection with the operation of the Real Property or the Leased Real Property, including without limitation, such Authorizations relating to the treatment, storage, disposal or Release of Hazardous Materials, have been duly obtained or filed and disclosed to the St. Luke's Entities. Each Warren Company is in compliance in all material respects with the terms and conditions of all such applicable Authorizations. To the Knowledge of any Warren Entity, there is no basis for revocation or suspension of any such Authorizations.

(iv) There are no pending or, to the Knowledge of any Warren Company, threatened actions, suits, claims, orders, liens, decrees, investigations, or proceedings against any Warren Company or any other Person for whose conduct any Warren Company is, or is reasonably expected to be, responsible, in each case with respect to the Real Property or the Leased Real Property, which relate to (i) contribution, response, removal, or remedial obligations of any Warren Company under any applicable Environmental Laws, or common law; (ii) violations by any Warren Company of any applicable Environmental Law; (iii) personal injury, property damage or natural resources damages relating to the generation, handling, use, treatment, storage, transportation, disposal or Release of Hazardous Materials from the Real Property or the Leased Real Property, or in connection with any Health Service operated by any Warren; or (iv) been subject to or to the Knowledge of any Warren Company threatened with any government or citizen action with respect to any Environmental Laws; and no Warren Company has reason to believe that any of the above will be forthcoming.

(v) Since January 1, 2006, no Warren Company has, with respect to any of the Real Property or the Leased Real Property: (i) entered into or been issued by a Government Body any consent decree, compliance order, or administrative order pursuant to any Environmental Law; (ii) received a notice under the citizen suit provisions of any Environmental Law; or (iii) received any request for information, notice, demand letter, administrative inquiry, or formal or informal complaint or claim or suit with respect to any Environmental Condition at or emanating from any of the Real Property or the Leased Real Property or associated with the operations of any Warren Entity.

638197.15

(vi) There are not now, and to the Knowledge of any Warren Entity there previously have not been, any underground storage tanks (as such term is defined under N.J.A.C. 7:14B-1.6) located at the Real Property or the Leased Real Property.

(vii) None of the Warren Companies is an "industrial establishment" as such term is defined under ISRA.

(viii) The Warren Entities have made available to the St. Luke's Entities copies of all environmental reports, assessments, studies, and audits in their respective possession, custody and control that have been prepared with respect to the Real Property. To the Knowledge of any Warren Entity, on its behalf and on behalf of all Warren Companies, no environmental reports, assessments, studies or audits exist or are in process relating to the Real Property.

### 5.19. Construction in Progress.

Schedule 5.19 contains a list of all material projects or construction in progress on the Real Property and any Contracts related thereto (the "Projects"). All Government Authorizations from all applicable Government Bodies for each stage of the Projects have been obtained and are in full force and effect. There are no material changes to the Projects from the plans submitted and approved by such Government Bodies.

### 5.20. Medical Staff Matters.

The Hospital has heretofore provided to St. Luke's true, correct and complete copies of the bylaws and rules and regulations of the Hospital medical staff and a list of all current members of the medical staff. Except as heretofore disclosed on Schedule 5.20 hereto, to the extent permitted by law and without waiving any privilege of confidentiality, there are no pending or, to the Knowledge of the Hospital, threatened disputes with applicants, staff members or allied health professionals with respect to the Hospital medical staff and all appeal periods in respect of any medical staff member or applicant against whom an adverse action has been taken have expired.

### 5.21. Restricted Assets / Endowment.

One or more of the Warren Companies is a party to those agreements or understandings identified on Schedule 5.21 pursuant to which such Warren Companies have accepted or received gifts, bequests, endowment and other benefits, or hold assets or loans which are either (i) restricted to, designated for, or conditioned upon a specific use, or (ii) conditioned upon their eventual return, transfer, or conveyance. A complete listing and description of such gifts, bequests, endowments and other benefits, assets or loans, and the related agreements and/or understandings, including an identification of any and all Warren Companies affected and the nature and scope of any such restriction, designation and condition, is attached hereto as Schedule 5.21.

5.22.  Insurance.

(a)  Schedule 5.22(a) sets forth a true and complete list of all insurance policies (including professional liability, general liability, property, casualty, fire, auto, business interruption, and directors and officers insurance), workers compensation programs and captive or self-insurance programs of any nature whatsoever that any Warren Company participates in or maintains with respect to its operations and affairs as of the date hereof, which list reflects the identity of insurers, terms and amounts of coverage, deductibles and policy numbers. Except as indicated on Schedule 5.22(a), all existing insurance policies covering the Warren Companies name as loss payee thereunder the Warren Company which owns such assets, maintains leasehold or other rights in such assets, or operates such businesses. All insurance proceeds received by any Warren Company and other rights under such policies impacted between the date hereof and the Closing Date shall become and remain an asset of such Warren Company from the date of receipt through the Closing Date.

(b)  Except as set forth in Schedule 5.22(b), there is no outstanding requirement or recommendation made by any insurance company that issued any policy listed on Schedule 5.22(a) or by any Board of Fire Underwriters or other similar functions which requires or recommends any repairs or other work to be done with respect to any of the assets or operations of any Warren Company. The Warren Companies have given to their insurer in a timely manner all notices required to be given under its insurance policies with respect to all claims and actions covered by insurance relating to any Warren Company, and, with respect to all claims submitted since January 1, 2006, no insurer has denied or reserved its rights in respect of or rejected any such claims in any material respect.

(c)  Schedule 5.22(c) sets forth, by year, for the current policy year through the date set forth thereon and each of the four (4) preceding policy years, a summary of the loss experience under each policy.

(d)  Except as set forth on Schedule 5.22(d), all policies to which any Warren Company is a party or that provide coverage to any Warren Company or any director, officer or employee of a Warren Company:

(i)  Are valid, outstanding and enforceable;

(ii)  Will continue in full force and effect following the consummation of the Transaction; and

(iii)  Do not provide for any retrospective premium adjustment or other experienced-based liability on the part of any Warren Company.

(e)  Except as set forth on Schedule 5.22(e), since January 1, 2006, no Warren Company has (i) received any refusal of coverage or any written notice that a defense will be afforded with reservation of rights; (ii) received any written notice of cancellation or any other indication that any insurance policy is no longer in full force or effect or will not be renewed or that the issuer of any policy is not willing or able to perform its obligations thereunder; or (iii) failed to give any required notice or present any claim which is still outstanding under any of

29

said policies, except to the extent that failure to provide notice or present any claim would not prejudice the Warren Company's rights thereunder.

(f) Except as set forth on Schedule 5.22(f), the Warren Companies have paid all premiums due, and have otherwise performed all of their respective obligations, under each policy to which any Warren Company is a party or that provides coverage to any Warren Company.

(g) Except as set forth on Schedule 5.22(g), each of the workers compensation programs and captive or self-insurance programs listed on Schedule 5.22(a) is sufficiently funded to satisfy the ultimate costs of both reported covered claims and covered claims incurred but not yet reported for the Warren Companies.

### 5.23.   Material Contracts.

(a) Attached hereto as Schedule 5.23 is a true and complete list and summary description of all Material Contracts which relate to or may affect any Warren Company or the operation thereof, including, (i) all Contracts with physicians, (ii) Contracts with payors for Health Services, including health insurance organizations, preferred provider organizations or other alternative delivery systems, (iii) joint venture or partnership Contracts, (iv) employment Contracts, (v) tenant leases, (vi) equipment leases, (vii) equipment service and maintenance Contracts, (viii) Contracts or licenses relating to data processing programs, software or source codes, (ix) Contracts with municipalities, (x) Contracts with labor organizations, and (xi) loan agreements, bonds, mortgages, liens or other security agreements. True, correct and complete copies of such Material Contracts have been delivered by Warren to St. Luke's.

(b) The Material Contracts constitute valid and legally binding obligations of each Warren Company that is a party thereto and, to the Knowledge of any Warren Entity, the other parties thereto, are enforceable in accordance with their terms, except as enforceability may be limited, restricted or delayed by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

(c) Each Material Contract delivered by the Warren Companies to St. Luke's or its agents constitutes the entire agreement by and between the respective parties thereto.

(d) Except as set forth on Schedule 5.23(d) or as contemplated by Schedule 10.6, all material obligations required to be performed by the Warren Companies, and by the other party thereto, under the terms of the Material Contracts have been performed, no act or omission has occurred or failed to occur which, with the giving of notice, the lapse of time or both would constitute a default under or breach of any Material Contract, and each Material Contract is now and will be upon and immediately after the Closing in full force and effect without default or breach on the part of any Warren Company that is a party thereto or, to the Knowledge of any Warren Entity, any other party thereto.

(e) Except as expressly set forth on Schedule 5.23(e), no Material Contract requires Consent, waiver or approval of the other party thereto relative to the Transaction and there are no rights of first refusal or options outstanding except as set forth in such Schedule.

(f)     Except as expressly set forth on Schedule 5.23(f), giving effect to the Transaction will not result in any penalty, premium or variation of the rights, remedies, benefits or obligations of any party under any of the Material Contracts.

(g)     With the exception of those Material Contracts or relationships listed on Schedule 5.23(d) or as contemplated by Schedule 10.5, none of the Warren Companies is in material default, and, to the Knowledge of each Warren Entity, no other party or parties thereto are in default, nor has any event occurred which with the giving of notice or the lapse of time, or both, would constitute a material default by any Warren Company that is a party to any Material Contract or by any third party, with respect to any term or condition of any of the Material Contracts.

(h)     With the exception of those Material Contracts or relationships listed on Schedule 5.23(d), none of the Warren Companies has received written or oral notice to the effect that any party to any of the Material Contracts intends to cancel, terminate or amend any of the Material Contracts or to exercise or not to exercise any outstanding options under any of the Material Contracts.

(i)     None of the Material Contracts violates or evidences an arrangement that violates any Legal Requirement.

### 5.24.  Computer Software, Etc.

Schedule 5.24 contains a list and general description of all computer software programs and similar systems owned by or licensed to each Warren Company or used in the conduct of its business operations ("Software"), and all licenses for the use of such Software. Schedule 5.24 also contains a list and general description of all software-as-a-service (SaaS), platform-as-a-Service (PaaS), infrastructure-as-a-service (IaaS), hosting, application service provider (ASP), and cloud computing agreements for the remote use of software or virtual hardware in the conduct of each Warren Company's business (all, "Software Services"). Except as set forth on Schedule 5.24, each Warren Company has the right to use the Software and Software Services, free and clear of any royalty or other payment obligations, claims of infringement or other liens. No Warren Company is in conflict with, or in violation or infringement of, nor has any Warren Company received any notice of any conflict with, or violation or infringement of, nor any claims or conflicts with any asserted rights of any other person with respect to any such Software or Software Services. Except as set forth in Schedule 5.24, effective upon the Closing Date, each Warren Company, without further action or the payment of fees, royalties or other compensation to any person arising solely by reason of the Transaction, shall be entitled to use all Software and Software Services currently used in the operations of such Warren Company in accordance with the applicable Software licenses and Software Services subscription agreements.

### 5.25.  Equipment.

Except as set forth in Schedule 5.25, all of the equipment used in the operation of the Warren Companies, whether reflected in the Warren Financial Statements or otherwise, is properly maintained and in good operating condition, except for reasonable wear and tear and except for items which have been written down in the Warren Financial Statements to a

31

realizable market value or for which adequate reserves have been provided in the Warren Financial Statements. No Person other than a Warren Company owns any equipment or other tangible assets situated on the Real Property, except for equipment or other tangible assets which is leased from a third party or as disclosed on Schedule 5.25.

### 5.26.  Inventory and Supplies.

All inventory and supplies of each Warren Company are carried at cost and are fairly presented in the Warren Financial Statements. Except for items which are obsolete, below standard quality or in the process of repair on the date of this Agreement and for which adequate reserves have been or will be provided, all items of supplies on hand on the date of this Agreement consist of items of a quality usable of saleable in the Ordinary Course of Business. The quantities of all supplies are reasonable and justified under the normal operations of the Warren Companies.

### 5.27.  Patents, Trademarks, Etc.

Schedule 5.27 contains a list and a general description of all patents, trade and product names, logos, trademarks and service marks (whether registered or unregistered), domain names, copyrights (including in each case registrations and applications therefore), inventions, discoveries, and trade secrets that are owned or licensed by each Warren Company which are used in the conduct of such entity's business operations (collectively, "Intellectual Property"). Each Warren Company has the right to use, free and clear of any royalty or payment obligations, claims of infringement or other liens, all of such items as are disclosed herein. No Intellectual Property other than that referenced in Section 5.24 or listed or described on Schedule 5.27 is used in the operation of the Warren Companies.

Except as set forth in Schedule 5.27:

(a)     Each Warren Company owns and possesses all right, title and interest in and to, or has a valid right to use, all of the Intellectual Property necessary for the operation of the business as presently conducted;

(b)     No Intellectual Property owned by a Warren Company (and no use thereof by a Warren Company) nor any activity of the business, infringes upon the Intellectual Property of any other person, and (ii) no claim by any other person contesting the validity, enforceability, use or ownership of any Intellectual Property owned or used by the Company is currently pending or, to the Knowledge of the Sellers, threatened;

(c)     No Intellectual Property (or use thereof), nor any product manufactured or sold by any other person infringes upon any Intellectual Property of a Warren Company, and (ii) the Sellers have not received any information as to any infringement or misappropriation by any third party with respect to the Intellectual Property of a Warren Company;

(d)     No present or former Affiliate, shareholder (including the Warren Companies and their Affiliates), officer, director or employee of a Warren Company owns or has any interest in any Intellectual Property or any trade secret, invention or process, if any, used by a Warren Company.

32

689197.15

(e)     Except as listed on Schedule 5.27, no Warren Company has granted to any Person any interest in its Intellectual Property by license, sublicense, contract, assignment, or otherwise.

(f)     Each Warren Company has kept secret and has not disclosed any proprietary or confidential information concerning the Intellectual Property to any Person other than (i) certain employees of the Company or (ii) to other parties in the Ordinary Course of Business, each of whom or which are subject to the terms of binding confidentiality agreements with respect thereto. Each Warren Company has taken commercially reasonable measures to protect the confidential and proprietary nature of its trade secrets.

(g)     Each current and former employee and independent contractor of each Warren Company has assigned irrevocably to the Company all right, title and interest in and to any Intellectual Property as well as any inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets, whether or not patentable or registerable under copyright or similar laws, constituting part of or relating, directly or indirectly, to the Company's business which such employee or former employee made, developed, conceived or reduced to practice alone or with others.

### 5.28.   Employees.

(a)     The Warren Companies have provided to St Luke's, as of the Execution Date, a complete and accurate list of the following information for each employee of the Warren Companies, including each employee on leave of absence or layoff status:  employer; name; job title; current compensation paid or payable; vacation and sick time accrued; and service credited for purposes of vesting and eligibility to participate under any Warren Company's pension, retirement, profit-sharing, cash bonus, severance pay, insurance, medical, welfare or vacation plan, or any other employee benefit plan.

(b)     Except as set forth in Schedule 5.28, no employee of any Warren Company is a party to, or is otherwise bound by, any agreement or arrangement, including any confidentiality, non-competition or proprietary rights agreement, between such employee and any other Person ("Proprietary Rights Agreement") that in any way materially affects or will materially affect (i) the performance of his or her duties as an employee of the Warren Companies as a result of the Transaction, or (ii) the ability of any Warren Company to conduct its business, including any Proprietary Rights Agreement with the Warren Company by any such employee. To the Knowledge of the Warren Entities, no director, officer or other key employee of any Warren Company intends to terminate his or her employment with such Warren Company.

(c)     The Warren Entities, have delivered to St. Luke's, as of the Execution Date, a complete and accurate list of the following information for each retired employee of the Warren Companies, or their dependents, receiving benefits or scheduled to receive benefits in the future:  name, pension benefit, pension option election, retiree medical insurance coverage, retiree life insurance coverage and other benefits.

**5.29.   Labor Relations; Compliance.**

Except as set forth on Schedule 5.29, no employee of any of the Warren Entities is represented by any union or other labor organization. Since January 1, 2006, there has not been, there is not presently pending or existing, and to the Knowledge of the Warren Entities there is not threatened, any:  (a) strike, slowdown, picketing, work stoppage or employee grievance process; (b) material legal proceeding against or affecting any Warren Company relating to the alleged violation of any Legal Requirement pertaining to labor relations or employment matters, including any charge or complaint filed by an employee or union with the National Labor Relations Board, the Equal Employment Opportunity Commission or any comparable Government Body, organizational activity, or other labor or employment dispute against or affecting any of the Warren Companies; or (c) application for certification of a collective bargaining agent. Since January 1, 2006, no event has occurred or circumstance exist that could reasonably be expected to provide the basis for any work stoppage or other labor dispute. There is no lockout of any employees by any Warren Company, and, to the Knowledge of the Warren Entities, no such action is contemplated by any. Each Warren Company is in compliance in all material respects with all Legal Requirements relating to employment, equal employment opportunity, nondiscrimination, immigration, wages, hours, benefits, collective bargaining, the payment of social security and similar taxes, occupational safety and health and plant closing, including the requirements of the federal Worker Adjustment and Retraining Notification Act of 1988 ("WARN") and the New Jersey plant closing law, known as the Millville Dallas Airmotive Plant Job Loss Notification Act. No Warren Company is liable for the payment of any material compensation, damages, taxes, fines, penalties or other amounts, however designated, for failure to comply with any of the foregoing Legal Requirements.

**5.30.   Employee Benefit Plans.**

(a)      Schedule 5.30(a) provides a list of each of the following which is sponsored, maintained, or contributed to by any Warren Company or any ERISA Affiliate, as defined below, for the benefit of the employees of any Warren Company:

(i)      Each "employee benefit plan" for the benefit of the employees of the Warren Companies, as such term is defined in Section 3(3) of ERISA, including employee benefit plans which are not subject to some or all of the provisions of ERISA (each, a "Plan"); and

(ii)     To the extent applicable to the employees, former employees or retirees of the Warren Companies, each personnel policy, collective bargaining agreement, bonus plan or arrangement, incentive award or compensation plan or arrangement, vacation policy, sickness policy, disability, death benefit, severance pay plan, policy or agreement, deferred compensation agreement or arrangement, executive compensation or supplemental income arrangement, consulting agreement, employment agreement, dependent care, life insurance program, and each other employee benefit plan, agreement, arrangement, program, practice, or understanding which is not described in Section 5.30(a)(i) (each, a "Benefit Program and Agreement").

(b)     True, correct and complete copies of each of the Plans and Benefit Programs and Agreements, and related trusts, if applicable, including all amendments thereto, have been furnished to St. Luke's. There has also been furnished to St. Luke's, with respect to each Plan required to file such report and description, the most recent report on Form 5500 and the summary plan description.

(c)     For purposes of this Agreement, the term "ERISA Affiliate" shall mean any person (as defined in Section 3(9) of ERISA) that together with any Warren Company (or any person whose liabilities any Warren Companies has assumed or is otherwise subject to) would be treated as a single employer under Section 4001(b) of ERISA, or would be aggregated with any Warren Company under Sections 414(b), (c), (m) or (o) of the Code.

(d)     Except as otherwise set forth on Schedule 5.30(d):

(i)     All obligations, whether arising by operation of law or by contract, required to be performed in connection with the Plans and the Benefit Programs and Agreements have been performed in all material respects, and there have been no material defaults or violations by any party to the Plans or Benefits Programs and Agreements;

(ii)     Attached hereto as Schedule 5.30(d)(ii) is a copy of the most recent favorable determination, or advisory opinion, letter from the Internal Revenue Service for each of the Plans intended to be qualified under Section 401 of the Code. Since receipt of the most recent favorable determination, or advisory opinion, letters, none of the Plans has been amended or operated in a way that would adversely affect such qualified and exempt status; and amendments necessary to continue such Plans' qualified status have been made. There has been no written or verbal notice from the IRS, the Department of Labor, a participant or beneficiary in such Plan bringing into question compliance with this paragraph of the Agreement.

(iii)     There are no actions, suits, or claims pending (other than routine claims for benefits) or, to the Knowledge of any Warren Entity, threatened against, or with respect to, any of the Plans or Benefit Programs and Agreements or their assets;

(iv)     All contributions required to be made to the Plans and Benefit Programs and Agreements pursuant to their terms and conditions have been timely made;

(v)     Within the three-year period preceding the date hereof, as to any Plan, any other employee pension benefit plan maintained by any current ERISA Affiliate, or any other employee pension benefit plan maintained by any former ERISA Affiliate (with respect to that period in which such former ERISA Affiliate was an ERISA Affiliate) subject to Title IV of ERISA ("Title IV Plan"), there has been no event or condition which presents the material risk of any Title IV Plan termination, no accumulated funding deficiency, whether or not waived,

within the meaning of Section 302 of ERISA or Section 412 of the Code, has been incurred; no reportable event within the meaning of Section 4043 of ERISA (for which the disclosure requirements of Regulation §2615.3 promulgated by the Pension Benefit Guaranty Corporation ("PBGC") have not been waived) has occurred; no notice of intent to terminate any Title IV Plan has been given under Section 4041 of ERISA; no proceeding has been instituted under Section 4042 of ERISA to terminate any Title IV Plan; and no liability to the PBGC has been incurred; and the assets of each Title IV Plan equal or exceed the actuarial present value of the benefit liabilities, within the meaning of Section 4041 or ERISA, under the Plan, based upon reasonable actuarial assumptions and the asset valuation principles established by the PBGC;

(vi)     There is no matter pending (other than routine qualification determination filings) with respect to any of the Plans or Benefit Programs or Agreements before the IRS, the DOL, or the PBGC;

(vii)    No Warren Company or any ERISA Affiliate has any liability, contingent or otherwise, relating to a Title IV Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA; and

(viii)   No Warren Company maintains or contributes to any defined benefit pension plan which is not a Title IV Plan.

(e)     Except as otherwise set forth in Schedule 5.30(e), no Warren Company is a party to any agreement, nor has any such entity established any policy or practice, requiring the Warren Company to make a payment or provide any other form of compensation or benefit, including severance or deferred compensation, to any person performing services for any Warren Company upon termination of such services which would not be payable or provided in the absence of the consummation of the Transaction.

(f)     Except as set forth in Schedule 5.30(f), in connection with the consummation of the Transaction, no payments have been or will be made under the Plans or Benefit Programs and Agreements which, in the aggregate, would result in imposition of the sanctions imposed under Section 280G or 409A of the Code.

(g)     Each Plan which is an "employee welfare benefit plan", as such term is defined in Section 3(1) of ERISA, may be unilaterally amended or terminated in its entirety by the Plan sponsor without the consent of any other person or entity and without liability, except as to benefits accrued thereunder prior to such amendment or termination.

(h)     Except as set forth in Schedule 5.30(h), no Warren Company presently maintains, contributes to or has any liability under any funded or unfunded medical, health or life insurance plan or arrangement for present or future retirees or future terminated employees for the benefit of the employees of the Warren Companies, except as required by the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended. Neither the Warren Companies nor any ERISA Affiliate maintains or contributes to a trust, organization or association for the

benefit of the employees of the Warren Companies or any ERISA Affiliate described in any of Sections 501(c)(9), 501(c)(17) or 501(c)(20) of the Code.

(i)     No tax liabilities have arisen and are currently unpaid with respect to a violation of Section 409A of the Code, nor is any tax liability expected to arise in connection with any payment as a result of the Transaction.

(j)     No event or condition exists that could subject the Warren Companies to any material tax under Section 4980B of the Code.

(k)     Neither the Warren Companies nor any Benefit Plan has engaged in any transaction that is considered by the IRS to be a listed transaction.

(l)     Except as set forth on Schedule 5.30(l), there have been no "prohibited transactions" within the meaning of Section 4975 of the Code or Part 4 of Subtitle B of ERISA in connection with any Benefit Plan that could reasonably be expected to subject the Warren Companies to a tax or penalty imposed by either Section 4975 of the Code or Section 502(l) of ERISA, and each Benefit Plan has been administered in all material respects in accordance with the applicable provisions of ERISA, the Code, and other applicable law and with the terms of all documents pursuant to which such Benefit Plans are maintained.

**5.31.  Certain Changes.**

Except as disclosed on Schedule 5.31, from the Balance Sheet Date there shall not have been or occurred with respect to any of the Warren Companies:

(a)     Any Material Adverse Change;

(b)     Any material damage, destruction or loss (whether or not covered by insurance) with respect to, or affecting the business or operations of, the Warren Companies;

(c)     Any increase in the compensation payable or to become payable by any Warren Company to any of its employees, officers, Senior Managers or agents, or any bonus payment or arrangement made to or with any employee, officer, Senior Manager or agent, except in the Ordinary Course of Business in accordance with existing personnel policies and disclosed to the St. Luke's Entities on Schedule 5.31;

(d)     Any labor dispute, employment or labor issue, including any union organizing efforts, adversely affecting the business or operations of the Warren Companies, other than individual personnel matters, which individually or in the aggregate are or would reasonably be expected to become material;

(e)     Any change in law or regulation, or any event or condition of any character, materially adversely affecting the business or operations of the Warren Companies;

(f)     Any sale, assignment, transfer or disposition by any Warren Company of any item of plant, property or equipment having a value in excess of Twenty Five Thousand Dollars ($25,000) (other than supplies), except in the Ordinary Course of Business;

(g)     The incurrence by any Warren Company of any liability or obligation of any nature (whether absolute, accrued, contingent or otherwise), except in the Ordinary Course of Business;

(h)     The payment, discharge or satisfaction by any Warren Company of any liability or obligation (whether absolute, accrued, contingent or otherwise) other than by payment, discharge or satisfaction in the Ordinary Course of Business;

(i)     The imposition on any of the assets of any Warren Company of any mortgage, pledge, lien, security interest, encumbrance or restriction, other than in the Ordinary Course of Business;

(j)     The cancellation or waiver by any Warren Company of any rights in respect of, or the sale, transfer, distribution or disposition of, any of its business assets, except in the Ordinary Course of Business;

(k)     Any change in any method of accounting or accounting practice affecting the Warren Companies;

(l)     Other than compensation paid in the ordinary course of employment, the payment of any amount to, or the payment of any amount on behalf of, or the sale of any assets to, or the entering into of any agreement or arrangement with, any Interested Person or Family Member (as defined in Section 5.32);

(m)     Any incurring or assumption of indebtedness for borrowed money, or any guarantee directly or indirectly, of indebtedness of others, by any Warren Company, except in the in the Ordinary Course of Business;

(n)     The payment by any Warren Company of any amount to any Government Body or any other third party of any claim, obligation, liability, loss, damage or expenses, of whatever kind or nature, incurred or imposed or based upon any Legal Requirement pertaining to environmental protection;

(o)     The initiation or prosecution of any transaction or transactions outside the Ordinary Course of Business which may cause a liability or obligation of any Warren Company in excess of Twenty Five Thousand Dollars ($25,000) in the aggregate; or,

(p)     The cancellation, termination or expiration of any insurance policy or coverage applicable to any Warren Company without similar insurance substituted therefore.

### 5.32.   Certain Affiliate Transactions.

Except as set forth in Schedule 5.32 hereto:

(a)     No officer, director, trustee, member, shareholder, Senior Manager or employee of any Warren Company acting with respect to the businesses and operations of the Warren Company ("Interested Person") and no member of the immediate family of an Interested Person of any such Company ("Family Member"), directly or indirectly, (i) owns an interest in

any corporation, partnership, proprietorship or other Company, other than securities in a publicly traded company, which sells to or purchases from any Warren Company products or services with respect to the operations of the Warren Companies; (ii) holds a beneficial interest in any Material Contract or agreement relating to the operations of any such Warren Companies to which any Warren Company is a party or by which such Company may be bound; or (iii) has asserted in writing any claim or cause of action of any kind whatsoever against any Warren Company;

(b)     No Warren Company is indebted, either directly or indirectly, to any Interested Person or Family Member in any amount whatsoever relating to the operations of such Company with respect to the operations of the Warren Companies, other than current obligations for payments of salaries, bonuses and other fringe benefits for past services rendered; and

(c)     No Interested Person or Family Member is indebted to any Warren Company.

### 5.33.  Bank Accounts, Officers and Powers of Attorney.

Schedule 5.33 contains: (a) a list of all banks or other financial institutions (with account numbers) in which any of the Warren Companies maintain accounts, and the names of all Persons authorized to draw thereon or have access thereto; (b) the names of all incumbent directors and officers of the Warren Companies; and (c) the names of all persons holding powers of attorney from any of the Warren Companies and a summary statement of the terms thereof.

### 5.34.  Brokers and Finders.

None of the Warren Companies nor any officer, director, employee or agent thereof has engaged any finder or broker in connection with the Transaction.

### 5.35.  Hill-Burton Obligations.

The Transaction will not result in any obligation on any Party to repay any loans, grants or loan guarantees or to provide uncompensated care in consideration thereof pursuant to the Hospital Survey and Construction Act of 1946 (the "Hill-Burton Act") or any similar statute or program with respect to any of the Warren Companies. Any obligations or liabilities of the Warren Companies under such statutes or programs are identified on Schedule 5.35.

### 5.36.  No Omissions or Misstatements.

To the Knowledge of each Warren Entity, none of the information included in this Agreement, the related Schedules and Exhibits, or other documents furnished or to be furnished by any Warren Company, contains or will contain as of the Closing Date, any untrue statement of a material fact or is misleading in any material respect or omits to state any material fact necessary to make any of the statements contained herein or therein not misleading.

VI.    REPRESENTATIONS AND WARRANTIES OF ST. LUKE'S ENTITIES

Except as otherwise specifically set forth hereafter, each of the St. Luke's Entities represents and warrants to the Warren Entities that the following facts and circumstances are as of the date hereof, and, except as contemplated hereby, on the Closing Date shall be, true and correct:

### 6.1.  Organization.

Each of the St. Luke's Entities is a nonprofit corporation, duly organized and validly subsisting under the laws of the Commonwealth of Pennsylvania.

### 6.2.  Corporate Powers; Consents; No Conflicts.

(a)    Each St. Luke's Entity has the requisite right, corporate power and authority to execute and deliver this Agreement and all other agreements and instruments to be executed in connection with the Transaction, and perform its respective obligations hereunder and with respect thereto.

(b)    The execution, delivery and performance of this Agreement by the St. Luke's Entities and all other agreements ancillary hereto to which any of them is a party and the consummation of the Transaction by the St. Luke's Entities:

(i)    Are not in contravention of any Legal Requirement or the terms of any St. Luke's Entity's Certificate of Incorporation, Bylaws or other organizational documents or resolution adopted by their respective Governing Boards or members; or

(ii)    Will not contravene, conflict with or result in a violation of any of the terms or requirements of, or give any Government Body the right to revoke, withdraw, suspend, cancel, terminate or modify, any material Government Authorization that is held by any St. Luke's Entity or that otherwise materially relates to the business of, or any of the assets owned or used by, any St. Luke's Entity, that would cause a material adverse change with respect to the St. Luke's Entities' ability to consummate the Transaction; or

(iii)    Will not give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate or modify, any Contract to which the St. Luke's Entities are a party.

(c)    Except for those Consents set forth on Schedule 6.2 (the "St. Luke's Required Consents"), none of the St. Luke's Entities is or will be required to provide notice to, file with, or obtain any Consent from, any Government Body or Person in connection with the execution or delivery of this Agreement or the performance of the Transaction.

40

### 6.3.    Tax-Exempt Status.

The St. Luke's Entities are organizations described in Section 501(c)(3) of the Code, are exempt from federal income taxation under Section 501(a) of the Code, and are not private foundations as defined in Section 509(a) of the Code. To the Knowledge of the St. Luke's Entities, no event has occurred and no condition exists which might jeopardize the existing tax-exempt status of such St. Luke's Entities.

### 6.4.    Binding Effect.

This Agreement and all other agreements entered into in connection herewith to which the St. Luke's Entities are or will become a party hereunder are and shall, as of the date hereof and the Closing Date, constitute the valid and legally binding obligation of such St. Luke's Entities and are enforceable against each of them, in accordance with the respective terms hereof and thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity. The execution and delivery of this Agreement and all other agreements entered into in connection herewith to which the St. Luke's Entities are or will become a party have been duly authorized by all necessary corporate, partnership, limited liability company or other entity action on the part of the applicable St. Luke's Entity and no further authorization or consent of the Governing Board of such St. Luke's Entity is or shall be necessary.

### 6.5.    Financial Information.

The St. Luke's Entities have made available to the Warren Entities, or shall make available to the Warren Entities prior to Closing, true, correct and complete copies of their consolidated audited financial statements for the fiscal years ended June 30, 2010, 2009 and 2008 and unaudited consolidated balance sheets, statements of operations and changes in net assets and statements of cash flows as of December 31, 2010 ("St. Luke's Financial Statements").

The St. Luke's Financial Statements are true, complete and accurate and fairly present the financial condition and results of operations at the respective dates thereof and for the periods therein referenced, and have been prepared in accordance with GAAP, subject in the case of unaudited interim financial statements to the absence of notes and to normal, recurring year-end adjustments and accruals consistent with past practices, and the St. Luke's Financial Statements reflect the consistent application of such accounting principles throughout the periods involved, except as otherwise disclosed therein.

Except as set forth in the St. Luke's Financial Statements, there are no contingent or other liabilities or obligations that present any substantial likelihood, in the reasonable judgment of the St. Luke's Entities, of adversely affecting the ability of the St. Luke's Entities to consummate the Transaction.

6.6.    **Brokers and Finders.**

None of the St. Luke's Entities nor any officer, director, employee or agent thereof has engaged any finder or broker in connection with the Transaction.

6.7.    **Government Authorizations.**

The St. Luke's Entities currently maintain all material Government Authorizations necessary or required by law to conduct their respective operations as currently conducted other than Government Authorizations which, if not maintained, individually or in the aggregate, would not cause a material adverse event with respect to the respective St. Luke's Entity.

6.8.    **Medicare Participation; Cost Reports; Accreditation.**

(a)      Each of the St. Luke's Entities that operates or provides a Health Service is duly qualified for participation in the Programs, has a current and valid provider agreement with such Programs and is fully eligible to receive payment under Titles XVIII and XIX of the Social Security Act with respect to such Programs. Each such entity providing a Health Service is certified as a provider under the Programs, is in compliance with the conditions of participation in the Programs, and has received all approvals or qualifications necessary for capital reimbursement for its services under such Programs, except to the extent that noncompliance would not, individually or in the aggregate, cause a material adverse event with respect to the respective St. Luke's Entity.

(b)      All cost reports required to be filed by the St. Luke's Entities providing Health Services have been timely filed and are complete and correct in all material respects.

(c)      The St. Luke's Entities required to be accredited by the Joint Commission are so duly accredited for a three year period commencing on the date of its last accreditation.

6.9.    **Litigation or Proceedings.**

Except to the extent set forth on Schedule 6.9, there are no claims, actions, suits, charges, hearings, arbitrations, mediations, or other proceedings or investigations (whether civil, criminal or administrative) pending by or against, or, to the best Knowledge of any St. Luke's Entity, threatened against any of the St. Luke's Entities, or their respective officers, directors or trustees, at law or in equity, that presents any substantial likelihood, in the reasonable judgment of the St. Luke's Entities, of affecting their ability to consummate the Transaction.

6.10.    **Compliance Program.**

The St. Luke's Entities have a compliance program and have provided or made available to the Warren Entities a copy of all their current compliance policy and related program materials.

### 6.11. Tax-Exempt Bond Debt.

(a)     The Transaction will not cause or result in a default or an event of default under the terms of any master trust indenture relating to the St. Luke's Entities' tax-exempt bond debt that would cause a material adverse event with respect to the ability of St. Luke's to consummate the Transaction.

(b)     To the St. Luke's Entities' Knowledge, no St. Luke's Entity is in material violation of any of the terms and conditions of any master trust indenture relating to the St. Luke's Entities' tax-exempt bond debt, and no event or condition exists and is continuing which would or could, with the passage of time, constitute an event of default under any such documents, except to the extent that any such violation would not, individually or in the aggregate, cause a material adverse event with respect to the ability of St. Luke's to consummate the Transaction.

### 6.12. No Omissions or Misstatements.

To the Knowledge of the St. Luke's Entities, none of the information included in this Agreement, the related Schedules and Exhibits, or other documents furnished or to be furnished by the St. Luke's Entities, contains or will contain as of the Closing Date, any untrue statement of a material fact, is misleading in any material respect or omits to state any material fact necessary to make any of the statements contained herein or therein not misleading.

## VII.    COVENANTS OF THE WARREN ENTITIES PRIOR TO CLOSING

### 7.1.    Access and Investigation.

From the date hereof through the Closing Date, the Warren Entities shall afford to the St. Luke's Entities and their counsel, accountants and other representatives reasonable access during normal business hours and upon reasonable notice to all of the offices, properties, books, contracts, commitments, records and affairs of the Warren Companies, and shall furnish to the St. Luke's Entities copies of all documents and information concerning the properties and affairs of any Warren Company as the St. Luke's Entities may reasonably request, provided that any such inspection shall not unreasonably impede the normal day-to-day business operation of the Warren Entities. If any such books, records and materials are in the custody of third parties, any appropriate Warren Company shall direct such third parties to promptly provide them to St. Luke's.

### 7.2.    Operation of Warren Company Businesses.

From the date hereof until the Closing Date, the Warren Entities shall:

(a)     Use commercially reasonable best efforts and shall do or cause to be done all such acts and things as may be commercially reasonable to preserve, protect and maintain intact the business and operations of the Warren Companies as going concerns consistent with the Ordinary Course of Business; provided, however, that Warren shall not (i) enter into any new lease or leases of real property or amend or renew any Warren Leases, pursuant to renewal options, or otherwise, without the prior written consent of St. Luke's, not to be unreasonably

withheld or (ii) enter into or amend any Contract involving future payments or performance of services or delivery of goods or material, to or by any of the Warren Entities, of any amount not in the fiscal year 2011 operating budget, a true, accurate and complete copy of which is attached hereto as Exhibit K, or in all other cases, in excess of $25,000 in the aggregate, without the prior written consent of St. Luke's, not to be unreasonably withheld;

(b)     Use commercially reasonable efforts to (i) keep available the services of the current officers, Senior Managers, employees and agents of such Warren Company, and (ii) maintain the relations and goodwill with patients, physicians, creditors, suppliers and others having business relationships with the Warren Companies;

(c)     Maintain all plant and equipment in the condition it was found on the date of execution of this Agreement, subject to normal wear and tear;

(d)     Maintain all licenses, permits and government authorizations in effect without any qualification;

(e)     Advise the St. Luke's Entities with respect to all operational matters of a material nature, other than those occurring in the Ordinary Course of Business;

(f)     Not allow any Warren assets to be subjected to any lien, claim or encumbrance (other than Permitted Encumbrances) without the prior written consent of St. Luke's, which consent will not be unreasonably withheld, conditioned or delayed; and,

(g)     To the extent permissible under the applicable Legal Requirements, obtain St. Luke's written consent prior to any Warren Company taking any action or forging taking any reasonable action within its control, as a result of which any of the changes or events listed in Section 5.31 is likely to occur.

### 7.3.    Consents.

As promptly as practicable after the date of this Agreement, each Warren Company shall apply for, and use its best efforts to obtain, the Warren Required Consents, including all Government Authorizations necessary to enable the St. Luke's Companies to consummate the Transaction and operate the Warren Company businesses. Between the date of this Agreement and the Closing Date, each Warren Entity shall provide its reasonable cooperation and assistance to the St. Luke's Companies with respect to their efforts to obtain the St. Luke's Consents.

### 7.4.    Risk of Loss.

The Warren Entities covenant that they shall maintain insurance in the amounts described by their representations and warranties in Section 5.22 to cover any material claim, including professional liability, directors and officers, casualty, damage or destruction of any portion of the facilities of the Warren Companies prior to the Closing Date.

### 7.5.   Antitrust.

The Warren Entities recognize that Federal and New Jersey antitrust laws impose restrictions on the joint conduct of actual or potential competitors. The Warren Entities acknowledge that during the period starting on the date of this Agreement and ending on the Closing Date, the Warren Entities and their respective directors, trustees, officers, employees, affiliates and agents shall observe and comply with such protocols and guidelines for conduct as may be suggested by their legal counsel to avoid antitrust concerns.

### 7.6.   No-Shop Clause.

From the date hereof until the termination of this Agreement, pursuant to Article XI below, the Warren Entities shall not, directly or indirectly, without the written approval of St. Luke's, solicit, initiate or encourage any inquiries or proposals from, discuss or negotiate with, provide any non-public information to, or consider the merits of any unsolicited inquiries or proposals from, any Person (other than the St. Luke's Entities and their Affiliates) relating to any transaction involving the sale of the business or any assets (other than in the Ordinary Course of Business) of any Warren Company, or any of the membership interests or capital stock of any Warren Company, or any merger, consolidation, membership substitution, business combination or similar transaction involving any Warren Company.

### 7.7.   Updates of Representations and Warranties; Schedules.

Between the date of this Agreement, and the Closing Date, the Warren Entities shall (a) refrain from taking any action which would render any representations and warranties contained in Article V hereof inaccurate as of the Closing of the Transaction; (b) within three (3) business days notify St. Luke's of any lawsuits, claims, administrative actions, investigations, or other proceedings asserted or commenced against them, their directors, officers, trustees, members or Affiliates involving or affecting in any way the consummation of the Transaction or otherwise, and (c) within three (3) business days notify St. Luke's of any facts or circumstances of which they gain Knowledge which cause, or through the passage of time may cause, any change in any of the Warren Entities' representations and warranties or in their Schedules or Exhibits referred to in this Agreement at any time from the date hereof to the Closing Date. In the event that any action or occurrence contemplated by clauses (b) and/or (c) above requires the Warren Entities to provide the notice set forth thereunder, then within ten (10) business days from such notice, the Warren Entities shall deliver to St. Luke's revised Schedules that accurately and completely reflect any and all such changes in the facts and circumstances. The foregoing obligations shall continue up to and through the time of Closing. In addition to the foregoing, on the first day of each month following the Execution Date through the Closing Date, and again on the Closing Date (regardless of the date thereof), the Warren Entities shall deliver to St. Luke's Entities an updated list reflecting all changes to the information originally contained in the list described in Section 5.28(a), and each subsequent list thereafter, which updated list shall be complete, true and accurate as and when delivered to the St. Luke's Entities.

45

### 7.8.  HSR Filing.

As promptly as practicable, but in no event later than the thirtieth (30th) day following the delivery to St. Luke's of all final appraisals, valuations and other evaluations set forth on Schedule 10.13, the Warren Entities and the St. Luke's Entities shall each file or cause to be filed with the FTC and the Department of Justice all notifications required to be filed under the HSR Act and the rules and regulations promulgated thereunder with respect to the Transaction. The Warren Entities and the St. Luke's Entities shall consult with each other as to the appropriate time of filing such notifications and shall agree in good faith upon the timing of such filings, respond promptly to any requests for additional information made by either of such agencies, and cause the waiting periods under the HSR Act to terminate or expire at the earliest possible date after the date of filing. All filing fees to be paid in connection with such filing shall be shared equally by the Warren Entities and the St. Luke's Entities. Subject to Section 7.5, the Warren Entities and the St. Luke's Entities shall (i) promptly prepare and file all necessary documentation, (ii) effect all necessary applications, notices, petitions and filings and execute all agreements and documents, and (iii) use all commercially reasonable efforts to obtain all necessary consents, approvals and authorizations of all other parties, in the case of each of the foregoing clauses (i), (ii) and (iii), necessary or advisable to consummate the Transaction.

### 7.9.  Cooperation Regarding Bonds.

The Warren Entities shall cooperate with the St. Luke's Entities in order to obtain approval of the New Jersey Health Care Facilities Financing Authority (the "Authority"), Allstate, any holders of any bonds issued with respect to the St. Luke's Entities (or their predecessors), if necessary, or any trustee or other fiduciary acting on behalf of any of the foregoing parties, to effectuate the transactions set forth in Schedule 7.9 with respect to the Warren Bonds. At the Closing, it is the intent of the Parties that the Authority shall deliver to Allstate the New Warren Bonds in accordance with the Plan of Restructuring, which shall be acceptable to Allstate as required by Section 10.4 hereof. It is also the intent of the parties to obtain at Closing the unqualified, approving opinion of the firm of Wilentz, Goldman and Spitzer, P.A. (or such other nationally recognized law firm in the area of public finance approved by the Authority), addressed to, inter alia, the Authority and Allstate stating with respect to the New Warren Bonds and the Plan of Restructuring, under existing law, that (a) interest thereon is excluded from gross income of the owners thereof for federal income tax purposes pursuant to Section 103 of the Code and is not an item of tax preference under Section 57 of the Code for purposes of computing the alternative minimum tax and is taken into account in the calculation of adjusted current earnings for purposes of the alternative minimum tax imposed on corporations, and (b) interest thereon and net gains from the sale thereof are exempt from the tax imposed by the New Jersey Gross Income Tax Act. At or prior to the Closing, the Warren Entities shall obtain all corporate approvals and shall execute any and all agreements, indentures, notes, security agreements and other contracts and instruments with any of the foregoing parties necessary or required to consummate the transaction described in Schedule 7.9 and the Plan of Restructuring.

**7.10.  CHAPA Filing.**

As promptly as practicable after the Execution Date, the Warren Entities shall make all necessary filings, and submit all necessary or appropriate documents and information, required with respect to the Transaction under CHAPA and necessary to obtain expeditiously the Government Authorizations required thereunder.

## VIII.  COVENANTS OF THE ST. LUKE'S ENTITIES PRIOR TO CLOSING

**8.1.  Access and Investigation.**

From the date hereof through the Closing Date, the St. Luke's Entities shall furnish to the Warren Entities, and their counsel, copies of all relevant documents and furnish such information concerning the properties and affairs of the St. Luke's Entities as the Warren Entities may reasonably request.

**8.2.  Consents.**

As promptly as practicable after the date of this Agreement, each St. Luke's Entity shall apply for, and use its best efforts to obtain, the St. Luke's Required Consents, including all Government Authorizations necessary to consummate the Transaction and operate the Warren Company businesses.  Between the date of this Agreement and the Closing Date, each St. Luke's Entity shall provide its reasonable cooperation and assistance to the Warren Entities with respect to their efforts to obtain the Warren Required Consents.

**8.3.  Updates of Representations and Warranties; Schedules.**

Between the date of this Agreement, and the Closing Date, the St. Luke's Entities shall (a) refrain from taking any action which would render any representations and warranties contained in Article VI hereof inaccurate as of the Closing of the Transaction; (b) promptly notify the Warren Entities of any lawsuits, claims, administrative actions, investigations, or other proceedings asserted or commenced against them, their directors, officers, trustees, members or Affiliates involving or affecting in any material way the consummation of the Transaction, and (c) promptly notify the Warren Entities of any facts or circumstances of which they gain knowledge, which cause, or through the passage of time may cause, any material change in any of the St. Luke's Entities' representations and warranties or in their Schedules or Exhibits referred to in this Agreement at any time from the date hereof to the Closing Date.

**8.4.  Antitrust.**

The St. Luke's Entities recognize that Federal and State antitrust laws impose restrictions on the joint conduct of actual or potential competitors.  The St. Luke's Entities acknowledge that during the period starting on the Execution Date and ending on the Closing Date, the St. Luke's Entities and their respective directors, trustees, officers, employees, affiliates and agents shall observe and comply with such protocols and guidelines for conduct as may be suggested by their legal counsel to avoid antitrust concerns.

### 8.5. HSR Filing.

As promptly as practicable, but in no event later than the thirtieth (30th) day following the delivery to St. Luke's of all final appraisals, valuations and other evaluations set forth on Schedule 10.13, the Warren Entities and the St. Luke's Entities shall each file or cause to be filed with the FTC and the Department of Justice all notifications required to be filed under the HSR Act and the rules and regulations promulgated thereunder with respect to the Transaction. The Warren Entities and the St. Luke's Entities shall consult with each other as to the appropriate time of filing such notifications and shall agree in good faith upon the timing of such filings, respond promptly to any requests for additional information made by either of such agencies, and cause the waiting periods under the HSR Act to terminate or expire at the earliest possible date after the date of filing. All filing fees to be paid in connection with such filing shall be shared equally by the Warren Entities and the St. Luke's Entities. Subject to Section 8.4, the Warren Entities and the St. Luke's Entities shall (i) promptly prepare and file all necessary documentation, (ii) effect all necessary applications, notices, petitions and filings and execute all agreements and documents, and (iii) use all commercially reasonable efforts to obtain all necessary consents, approvals and authorizations of all other parties, in the case of each of the foregoing clauses (i), (ii) and (iii), necessary or advisable to consummate the Transaction.

### 8.6. Warren Bonds.

As promptly as practicable after the Execution Date, the St. Luke's Entities shall take such action as they deem appropriate and expeditious in order to obtain approval of the Authority, Allstate, any holders of any bonds issued with respect to the St. Luke's Entities (or their predecessors), if necessary, or any trustee or other fiduciary acting on behalf of any of the foregoing parties, to effectuate the transactions set forth in Schedule 7.9 with respect to the Warren Bonds. At the Closing, it is the intent of the Parties that the Authority shall deliver to Allstate the New Warren Bonds in accordance with the Plan of Restructuring, which shall be acceptable to Allstate as required by Section 10.4 hereof. It is also the intent of the parties to obtain at Closing the unqualified, approving opinion of the firm of Wilentz, Goldman and Spitzer, P.A. (or such other nationally recognized law firm in the area of public finance approved by the Authority), addressed to, inter alia, the Authority and Allstate stating with respect to the New Warren Bonds and the Plan of Restructuring, under existing law, that (a) interest thereon is excluded from gross income of the owners thereof for federal income tax purposes pursuant to Section 103 of the Code and is not an item of tax preference under Section 57 of the Code for purposes of computing the alternative minimum tax and is taken into account in the calculation of adjusted current earnings for purposes of the alternative minimum tax imposed on corporations, and (b) interest thereon and net gains from the sale thereof are exempt from the tax imposed by the New Jersey Gross Income Tax Act.

### 8.7. Cooperation in CHAPA Filing.

The St. Luke's Entities shall extend to the Warren Entities all reasonable cooperation, and promptly prepare and provide all necessary documents and information to respond to requests of the Attorney General of the State of New Jersey pertaining to the St. Luke's Entities, with respect to the CHAPA filing and the obligations of the Warren Entities with respect thereto, as set forth in Section 7.10 hereof.

688197.15

## IX.    CONDITIONS TO WARREN ENTITIES' OBLIGATIONS

The obligation of each of the Warren Entities to effect the Transaction shall be subject to the fulfillment as of the Closing Date of each of the following conditions:

### 9.1.    Representations; Warranties; Covenants.

The representations and warranties of each of the St. Luke's Entities contained in this Agreement shall be true in all material respects when made, and, when read in light of any Schedules and Exhibits which may have been updated as of the Closing Date, shall be true and correct in all material respects on and as of the Closing Date, and the St. Luke's Entities shall have complied with, carried out and performed all covenants and agreements required to be complied with, carried out and performed by them prior to Closing under this Agreement.

### 9.2.    Performance.

Each document required to be delivered by the St. Luke's Entities must have been delivered, and all of the covenants and obligations the St. Luke's Entities are required to perform or to comply with pursuant to this Agreement at or prior to the Closing Date must have been duly performed and complied with in all material respects. Without limiting the generality of the foregoing, the St. Luke's Entities shall have delivered at or before Closing under this Agreement all documents, instruments, certificates and other items required under Section 4.2(b).

### 9.3.    Consents.

Each of the Consents identified in Schedule 6.2 shall have been obtained and shall be in full force and effect.

### 9.4.    Absence of Actions or Proceedings.

No suit, proceeding, injunction or other action before any court or any other Government Body shall have been instituted or threatened to restrain or prohibit the Transaction, and no Government Body shall have taken any other action or made any request of any Party as a result of which any of the Parties reasonably and in good faith deems it to be inadvisable to proceed with the Transaction.

### 9.5.    Antitrust.

The waiting period under the HSR Act applicable to the consummation of the Transactions shall have expired or been terminated by written notice received by the Warren Entities and the St. Luke's Entities from the FTC.

### 9.6.    CHAPA.

The Parties shall have received all necessary Government Authorization applicable pursuant to the provisions of CHAPA.

49

### 9.7.   Tax Matters.

All Parties and their respective counsel shall have received, in form and substance satisfactory to them, satisfactory evidence, in the form of an opinion or opinions of counsel, concerning (i) the continued federal income tax exemption of each of the Parties, under Section 501(a) of the Code, by virtue of their being organizations described in 501(c)(3) of the Code, following the Transaction; (ii) the continued status of each of the Warren Entities and the St. Luke's Entities as not being "private foundations," as defined in Section 509(a) of the Code; and (iii) the continued tax-exempt status of interest payable on the 2008A Warren Bonds or, alternatively, the New Warren Bonds.

### 9.8.   Government Investigation; Payments; Reporting.

The Warren Entities shall have the right, in their sole discretion, to terminate this Agreement prior to Closing upon written notice to the St. Luke's Entities in the event there is any: (a) notice, claim, action, proceeding or investigation by or before any Governmental Body relating to an actual or suspected material violation of any Legal Requirement relating to the St. Luke's Entities; (b) material refund, reimbursement, recoupment, fine, penalty, assessment, settlement amount or other form of payment to a Governmental Body by the St. Luke's Entities; or (c) material compliance issue that an St. Luke's Entity reports or otherwise discloses to a Governmental Body, or is identified by the Warren Entities as an issue that should be so reported or disclosed, relating to an actual or suspected violation of any Legal Requirement, in which the actual or potential liability with respect to any matter identified in subsections (a) - (c) above, exceeds Fifty Million Dollars ($50,000,000) (the "Compliance Termination Threshold") either individually or in the aggregate, except for amounts reserved on the books and records of the St. Luke's Entities relating thereto and disclosed in writing to the Warren Entities prior to the Execution Date. Failure of the Warren Entities to duly notify the St. Luke's Entities that they are terminating this Agreement in accordance with the foregoing within thirty (30) days of their Knowledge that the Compliance Termination Threshold has been attained shall be deemed a waiver of the contingency contained in this Section.

## X.   CONDITIONS TO ST. LUKE'S ENTITIES' OBLIGATIONS

The obligation of each of the St. Luke's Entities to effect the Transaction shall be subject to the fulfillment as of the Closing Date of each of the following conditions:

### 10.1.   Representations; Warranties; Covenants.

The representations and warranties of each of the Warren Entities contained in this Agreement shall be true in all material respects when made, and, when read in light of any Schedules and Exhibits which may have been updated as of the Closing Date, shall be true and correct in all material respects on and as of the Closing Date, and the Warren Entities shall have complied with, carried out and performed, in all material respects, all covenants and agreements required to be complied with, carried out and performed by them prior to Closing under this Agreement.

### 10.2.  No Material Adverse Change.

There shall have been no Material Adverse Change, provided that for purposes of this subsection only, any event, occurrence or condition described on Schedule 10.2 shall also be deemed to result in a Material Adverse Change.

### 10.3.  Performance.

Each document required to be delivered at or before Closing by the Warren Entities must have been delivered, including particularly, but without limitation, the New Jersey Attorney General's letter granting CHAPA approval and the revised and executed Executive Officer Employment Agreements, and all of the covenants and obligations the Warren Entities are required to perform or to comply with pursuant to this Agreement at or prior to the Closing Date must have been duly performed and complied with in all material respects. Without limiting the generality of the foregoing, the Warren Entities shall have delivered at or before Closing under this Agreement all documents, instruments, certificates and other items required under Section 4.2(a) and Section 7.7.

### 10.4.  Plan of Restructuring.

Warren shall have entered into a plan of restructuring with Allstate (the "Plan of Restructuring"), in accordance with the terms set forth on Schedule 10.4, with such changes as may be required by Allstate, and acceptable to St. Luke's in its sole discretion.

### 10.5.  Post-Foreclosure Arrangements with Wells Fargo Bank, N.A.

(a)      Either (i) the Hospital Entities (as defined in the Post-Foreclosure Agreement) and Wells Fargo shall have entered into the Post-Foreclosure Agreement;  or (ii) Wells Fargo shall have sold the credit facility secured by HMP to a party approved in writing by the Hospital Entities, and such party and the Hospital Entities shall have entered into an agreement which is identical in all material respects to the Post-Foreclosure Agreement; or (iii) at the foreclosure sale contemplated in the Post-Foreclosure Agreement, a third party bidder shall be the successful bidder for HMP, such bidder shall be approved in writing by the Hospital Entities, and such party and the Hospital Entities shall have entered into an agreement which is identical in all material respects to the Post-Foreclosure Agreement (such agreement or an agreement as described in clause (ii) of this subsection being referred to as a "Replacement Post-Foreclosure Agreement"); or (iv) the Hillcrest Litigation shall have been finally settled in a manner which provides to the Hospital Entities all of the rights and benefits of the Post-Foreclosure Agreement and is otherwise satisfactory to the St. Luke's in its discretion (the "Hillcrest Settlement").

(b)      The Post-Foreclosure Agreement, Replacement Post-Foreclosure Agreement or Hillcrest Settlement, as applicable, shall then be in full force and effect, the parties thereto shall be in compliance therewith, and no event shall have occurred which, with the passage of time or the giving of notice or both, would result in a default or breach of the such agreement by any party;

688197.15

(c)     Unless the Hillcrest Settlement shall first have occurred, Well Fargo (or its replacement under the Replacement Post-Foreclosure Agreement (the "Wells Fargo Replacement")) shall have foreclosed on the Property (as defined in the Post-Foreclosure Agreement) and, in connection therewith, Wells Fargo or its affiliate (or the Wells Fargo Replacement, if applicable) shall have succeeded to fee ownership of the Property in accordance with the provisions of the Post-Foreclosure Agreement or Replacement Post-Foreclosure Agreement, as applicable;

(d)     Without limitation of anything contained herein, in the Post-Foreclosure Agreement, or in a Replacement Post-Foreclosure Agreement, the following shall have occurred:

(i)     The Master Lease, Master Sublease and Hospital Subleases shall have been terminated and all obligations of the Hospital Entities (as defined in the Post-Foreclosure Agreement) thereunder shall have been terminated, released and waived;

(ii)     Wells Fargo (or the Wells Fargo Replacement or other owner of the Property if the event set out in subsection (b)(iv) shall have occurred, as applicable) and the Hospital Entities shall have entered into the New Hospital Leases for up to 68,600 square feet on the terms set forth in the Post-Foreclosure Agreement, and otherwise pursuant to such lease agreements in form and substance acceptable to St. Luke's in its discretion;

(iii)     Wells Fargo (or the Wells Fargo Replacement or other owner of the Property if the event set out in subsection (b)(iv) shall have occurred, as applicable) shall have provided or shall have agreed to provide a tenant improvement allowance for the TBO Premises (as defined in the Post-Foreclosure Agreement) in an amount and on terms acceptable to St. Luke's, provided, that in no event shall St. Luke's require an allowance of greater than $1,100,000; and

(e)     St. Luke's shall be satisfied, in its sole and absolute discretion, that:

(i)     All Agreed Rent (as defined in the Post-Foreclosure Agreement) shall have been paid in accordance with the requirements of Section 3.2(a) of the Post-Foreclosure Agreement;

(ii)     the Hillcrest Litigation (i) has been completed, settled or dismissed with prejudice or otherwise resolved in a manner satisfactory to St. Luke's, or (ii) is being prosecuted in a manner and with reasonably projected outcomes satisfactory to St. Luke's; and

(iii)     neither St. Luke's nor Warren nor any Affiliate thereof bears any unacceptable risk of claim, liability, loss, damage, cost or expense by reason of such parties' direct or indirect ownership interest in Hillcrest Medical Plaza, L.L.C.; and

(iv)     no Hospital Entity or other Warren Affiliate owes any obligation to, or is subject to any claim, by Hillcrest Medical Plaza, L.L.C. for payment or

otherwise, and, in connection therewith, Hillcrest Medical Plaza, L.L.C. shall execute a full waiver and release of all such parties in form and substance reasonably satisfactory to St. Luke's.

### 10.6. Plan to Pay Creditors; Use of Funds

Warren shall have completed a Plan to Pay Creditors as set forth on Schedule 10.6, including the entry into release agreements by the applicable Warren Entities and their respective creditors consistent with such plan, with such changes as are acceptable to St. Luke's in its sole discretion.

### 10.7. Required Consents.

Each of the Consents identified in Schedule 5.2 and Schedule 6.2 shall have been obtained and shall be in full force and effect.

### 10.8. Absence of Actions or Proceedings.

No suit, proceeding or other action before any court or any other Government Body shall have been instituted or threatened to restrain or prohibit the Transaction, and no Government Body shall have taken any other action or made any request of any Party as a result of which any of the Parties reasonably and in good faith deems it to be inadvisable to proceed with the Transaction.

### 10.9. Good Standing Certificates.

The St. Luke's Entities shall have received Good Standing Certificates for each of the Warren Companies, all certified by the Department of the Treasury of the State of New Jersey at least ten (10) days preceding the Closing Date.

### 10.10. Due Diligence Review.

The St. Luke's Entities' due diligence investigation shall have been materially completed, and the St. Luke's Entities shall have been satisfied with the results thereof in its sole discretion.

### 10.11. Title Insurance.

If required by St. Luke's, at its sole discretion, Warren shall, at its cost and expense, have obtained at closing an owner's title insurance policy or policies (or bring-downs of existing policies) for any or all Owned Real Estate, insured by a title insurance company acceptable to St. Luke's, in its reasonable discretion, at regular rates free of objections of any kind except the permitted exceptions pursuant to a full coverage owner's title insurance policy (1992 ALTA form), including such endorsements as St. Luke's may reasonably require, including without limitation a non-imputation endorsement satisfactory to St. Luke's, if requested.

### 10.12. Opinions of Counsel

The St. Luke's Entities shall have received from (i) counsel to the Warren Entities an opinion dated as of the Closing Date substantially in the form attached hereto as Exhibit G and (ii) counsel to Warren Risk Retention Group, Inc., an opinion dated as of the Closing Date, in form acceptable to the St. Luke's entities, as to the due organization, valid existence and good standing of Warren Risk Retention Group, Inc. and that the Transaction does not affect the ownership interests or rights which the Warren Companies have in Warren Risk Retention Group, Inc.

### 10.13. Receipt of Appraisals, Valuations and Other Evaluations

The Parties shall have timely received from appropriately certified appraisers or similarly qualified Persons, who shall be engaged by St. Luke's but shall be acceptable to Warren, required appraisals, valuations and other evaluations of the Warren Entities as are set forth on Schedule 10.13, and St. Luke's shall be satisfied with the results thereof in its sole discretion, provided, however, that such appraisals shall, at a minimum, satisfy, to the extent applicable, (i) the requirements of CHAPA; (ii) the requirements of the Code necessary to enable the respective counsel to the Parties to render the opinions described in Section 9.7 and Section 10.17 hereof; (iii) the requirements necessary to effectuate the transactions described in Schedule 7.9 hereto; (iv) the fair market analysis required by the St. Luke's Board of Trustees and the St. Luke's Hospital Board of Trustees and (v) the fair market valuation requirements of the HSR Act and the rules and regulations promulgated thereunder. It is understood that ordering of any such appraisals, valuations and other evaluations shall occur promptly in order that such items shall be in final and sufficient form in order to be used in connection with the satisfaction of any filing requirements.

### 10.14. Secretary's Certificate

The St. Luke's Entities shall have received from the Warren Entities Secretaries' Certificates in the form set forth in Schedule 10.14.

### 10.15. Antitrust.

The waiting period under the HSR Act applicable to the consummation of the Transactions shall have expired or been terminated by written notice received by the Warren Entities and the St. Luke's Entities from the FTC.

### 10.16. CHAPA.

The Parties shall have received all Government Authorizations pursuant to the provisions of CHAPA.

### 10.17. Tax Matters.

All Parties and their respective counsel shall have received, in form and substance satisfactory to them, satisfactory evidence, in the form of an opinion or opinions of counsel, concerning (i) the continued federal income tax exemption of each of the Parties, under Section

501(a) of the Code, by virtue of their being organizations described in 501(c)(3) of the Code, following the Transaction; (ii) the continued status of each of the Warren Entities and the St. Luke's Entities as not being "private foundations," as defined in Section 509(a) of the Code; and (iii) the continued tax-exempt status of interest payable on the 2008A Warren Bonds or, alternatively, the New Warren Bonds.

## XI.  TERMINATION

### 11.1.  Termination.

This Agreement may be terminated by either St. Luke's (on behalf of the St. Luke's Entities) or Warren (on behalf of the Warren Entities) upon written notice at any time prior to Closing:

(a)  If the Closing has not occurred (other than through the failure of the Party seeking to terminate this Agreement to comply fully with its obligations hereunder) by December 31, 2011 or such later date as the Parties may agree in writing;

(b)  By mutual written consent of the Parties;

(c)  If any representation or warranty by any other Party is untrue in any material respect, or there has been a material breach of any warranty, covenant or obligation set forth in this Agreement on the part of any of the other Parties, and any such misrepresentation or material breach has not been cured after receiving thirty (30) days written notice thereof;

(d)  By the Warren Entities if any of the conditions under Article IX have not been satisfied as of the Closing Date, or the satisfaction of any such condition is or becomes impossible (other then through the failure of the Warren Entities to comply with their obligations under this Agreement) and the Warren Entities have not waived such condition in writing on or before the Closing Date; or

(e)  By the St. Luke's Entities if any of the conditions under Article X have not been satisfied as of the Closing Date, or the satisfaction of any such condition is or becomes impossible (other then through the failure of the St. Luke's Entities to comply with their obligations under this Agreement) and the St. Luke's Entities have not waived such condition in writing on or before the Closing Date; and

(f)  By St. Luke's pursuant to Section 11.3 below.

### 11.2.  Expense Reimbursement Upon Termination.

(a)  In the event that this Agreement is terminated by the St. Luke's Entities pursuant to Section 11.1(a), (c) or (e), the Warren Entities shall pay, or cause to be paid, to the St. Luke's Entities, an amount equal to the documented out-of-pocket legal, accounting, consulting and other third party fees and expenses incurred by the St. Luke's Entities in connection with this Agreement and the Transaction not to exceed One Million Two Hundred and Fifty Thousand Dollars ($1,250,000). Such amount shall be paid by wire transfer within three (3) days following delivery of such documentation by the St. Luke's Entities to the Warren

Entities. Notwithstanding the foregoing, the amounts described in this Section 11.2(a) shall only be payable by the Warren Entities if the failure to proceed with the Closing pursuant to Section 11.1(a), the untruth or material breach described in Section 11.1(c), or the failure to satisfy the conditions pursuant to Section 11.1(e) resulting in the termination by the St. Luke's Entities was or is within the reasonable control of the Warren Entities and the Warren Entities failed to take commercially reasonable action or failed to avoid taking any action giving rise to the foregoing; provided, however, that any termination resulting from a breach of Section 7.6 shall be deemed to have been within the reasonable control of the Warren Entities. The obligation to pay the amounts described in this Section 11.2(a) shall survive termination of this Agreement.

(b)     In the event that this Agreement is terminated by the Warren Entities pursuant to Section 11.1(a), (c) or (d), the St. Luke's Entities shall pay, or cause to be paid, to the Warren Entities, an amount equal to the documented out-of-pocket legal, accounting, consulting and other third party fees and expenses incurred by the Warren Entities in connection with this Agreement and the Transaction not to exceed Five Hundred Thousand Dollars ($500,000). Such amount shall be paid by wire transfer within three (3) days following delivery of such documentation by the Warren Entities to the St. Luke's Entities. Notwithstanding the foregoing, the amounts described in this Section 11.2(b) shall only be payable by the St. Luke's Entities if the failure to proceed with the Closing pursuant to Section 11.1(a), the untruth or material breach described in Section 11.1(c), or the failure to satisfy the conditions pursuant to Section 11.1(d) resulting in the termination by the Warren Entities was or is within the reasonable control of the St. Luke's Entities and the St. Luke's Entities failed to take commercially reasonable action or failed to avoid taking any action giving rise to the foregoing. The obligation to pay the amounts described in this Section 11.2(b) shall survive termination of this Agreement.

### 11.3.   Schedules.

Notwithstanding any other provision of this Agreement, all Schedules required to be delivered by the Parties pursuant to this Agreement shall have been on or before the time of execution of this Agreement. It shall be deemed a condition precedent to the St. Luke's Entities' obligation to consummate the Closing that each of the Warren Entities' Schedules shall meet with the approval of the St. Luke's Entities, and it shall be deemed a condition precedent to the Warren Entities' obligations to consummate the Closing that each of the St. Luke's Entities' Schedules shall meet with the approval of Warren Entities. Notwithstanding the foregoing to the contrary, if any information contained in a Schedule delivered to St. Luke's pursuant to Section 7.7 after the execution of this Agreement is unsatisfactory to St. Luke's, St. Luke's, in its sole discretion, may terminate this Agreement at or before the Closing by written notice to the Warren Entities.

### XII.   INDEMNIFICATION

#### 12.1.   Indemnification of St. Luke's Entities by Warren Entities

(a)     The Warren Entities, on behalf of themselves and the other Warren Companies, shall keep and save the St. Luke's Entities, the St. Luke's Affiliates and their directors, trustees, officers, employees, agents and other representatives (the "St. Luke's Indemnified Parties"), forever harmless from and shall indemnify and defend the St. Luke's

56

Indemnified Parties against any and all obligations, judgments, liabilities, penalties, violations, fees, fines, claims, losses, costs, demands, damages, liens, encumbrances and expenses including reasonable attorneys' fees and court costs (collectively, "Damages"), whether direct or consequential and no matter how arising, to the extent connected with or arising or resulting from (i) any breach of any representation or warranty of any Warren Entity under this Agreement, (ii) any breach or default by any Warren Entity of any of their covenants or agreements under this Agreement, (iii) all federal, state and local income taxes relating to any Warren Company, or (iv) any act, conduct or omission of any Warren Company, or any event or circumstance pertaining to any Warren Company, that has first accrued, arisen, occurred or come into existence at any time prior to the Effective Date. If any lien, claim, charge or order for the payment of money shall be filed against any asset to be acquired by the St. Luke's Entities under this Agreement or any portion thereof, or against any of the St. Luke's Entities based on any act or omission or alleged act or omission of any Warren Entity, or their agents, representatives or employees, and whether or not such lien, claim, charge or order shall be valid or enforceable, within ten (10) days after notice to any Warren Entity of the filing thereof, such Warren Entity shall take any and all actions, by bonding, deposit, payment or otherwise, as will remove and satisfy such lien, claim, charge or order. No provision in this Agreement shall prevent any Warren Entity from pursuing any legal rights or remedies that may be granted to it by law against any Person other than the St. Luke's Entities. The indemnification obligations of the Warren Entities hereunder shall be joint and several.

(b)     St. Luke's shall promptly notify the Warren Entities in the event that any claim is made against any of the St. Luke's Indemnified Parties for which the Warren Entities have agreed to indemnify them as set forth in this Agreement, and the Warren Entities shall thereupon undertake to defend promptly and hold the St. Luke's Indemnified Parties free and harmless therefrom, using counsel satisfactory to St. Luke's. Once the defense thereof is assumed, the Warren Entities shall keep the respective St. Luke's Indemnified Parties advised of all material developments in the defense thereof and in any related litigation, and such St. Luke's Indemnified Parties shall be entitled at all times to participate in the defense thereof at its own expense. If the Warren Entities fail to discharge or undertake to defend against any such liability within twenty (20) days after notice thereof, then the respective St. Luke's Indemnified Parties may settle the same and shall provide notice of the terms thereof to the Warren Entities within ten (10) days after settlement. The Warren Entities' liability shall be conclusively established by such settlement (the amount of such liability shall include the settlement consideration and the reasonable attorneys' fees, costs and expenses incurred by the respective St. Luke's Indemnified Party in effecting such settlement). Notwithstanding any other provision of this Section 12.1, no Warren Entity shall have the right to defend a claim and control the defense, settlement and prosecution of any litigation if such claim or litigation arises with respect to, or relates to, an investigation brought against any St. Luke's Indemnified Party by or on behalf of the United States or any state government to the extent such claim includes allegations against a St. Luke's Indemnified Party on any basis other than pure successor liability (collectively, "Government Claims"). The St. Luke's Indemnified Parties shall have the right to defend, compromise and settle any Government Claims and the Warren Entities shall continue to indemnify the St. Luke's Indemnified Parties with respect to such Government Claims pursuant to this Section 12.1.

688197.15

## 12.2. Indemnification of Warren Entities by St. Luke's Entities.

(a)     The St. Luke's Entities shall keep and save the Warren Entities and their directors, trustees officers, employees, agents and other representatives (the "Warren Indemnified Parties"), forever harmless from, and shall indemnify and defend the Warren Indemnified Parties against, any and all Damages whether direct or consequential and no matter how arising, in any way related to, connected with or arising or resulting from (i) any breach of any representation or warranty of the St. Luke's Entities under this Agreement, (ii) any breach or default by the St. Luke's Entities of any of their covenants or agreements related to the Transaction, or (iii) any other obligation or liability specifically assumed by the St. Luke's Entities in this Agreement. No provision in this Agreement shall prevent any St. Luke's Entity from pursuing any legal rights or remedies that may be granted to it by law against any Person other than the Warren Entities.

(b)     The Warren Entities shall promptly notify the St. Luke's Entities in the event that any claim is made against any of the Warren Indemnified Parties for which the St. Luke's Entities have agreed to indemnify them as set forth in this Agreement, and the St. Luke's Entities shall thereupon undertake to defend promptly and hold the Warren Indemnified Parties free and harmless therefrom, using counsel satisfactory to the Warren Entities. Once the defense thereof is assumed, the St. Luke's Entities shall keep the respective Warren Indemnified Parties advised of all material developments in the defense thereof and in any related litigation, and such Warren Indemnified Parties shall be entitled at all times to participate in the defense thereof at its own expense. If the St. Luke's Entities fail to discharge or undertake to defend against any such liability within twenty (20) days after notice thereof, then the respective Warren Indemnified Parties may settle the same and shall provide notice of the terms thereof to the St. Luke's Entities within ten (10) days after settlement. The St. Luke's Entities' liability shall be conclusively established by such settlement (the amount of such liability shall include the settlement consideration and the reasonable attorneys' fees, costs and expenses incurred by the respective Warren Indemnified Party in effecting such settlement).

## 12.3.   Indemnification Assistance.

(a)     Any party entitled to indemnification hereunder (the "Indemnified Party") agrees to give the Party which would be liable for Damages to an Indemnified Party (the "Indemnifying Party") reasonable access to the books and records and employees of the Indemnified Party in connection with the matters for which indemnification is sought hereunder, to the extent the Indemnifying Party reasonably deems necessary in connection with its rights and obligations hereunder.

(b)     The Indemnified Party shall assist and cooperate with the Indemnifying Party in the conduct of litigation, the making of settlements and the enforcement of any right of contribution to which the Indemnified Party may be entitled from any Person in connection with the subject matter of any litigation subject to indemnification hereunder. In addition, the Indemnified Party shall, upon the reasonable request by the Indemnifying Party or counsel selected by the Indemnifying Party (with reimbursement of any reasonable fees, wages, costs or expenses incurred by the Indemnified Party or an employee thereof in connection therewith),

attend hearings and trials, assist in the securing and giving of evidence, assist in obtaining the presence or cooperation of witnesses, and make available its own personnel.

### 12.4. Effect of Investigation or Knowledge.

Any claim for indemnification shall not be adversely affected by any investigation by or opportunity to investigate afforded to a Party, nor shall such a claim be adversely affected by a Party's Knowledge on or before the Closing Date of any breach or inaccuracy of the type specified in this Article XII or of any state of facts that may give rise to such a breach or inaccuracy. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, shall not adversely affect the right to indemnification, payment of Damages or other remedy hereunder based on such representations, warranties, covenants or obligations.

### 12.5. Survival.

This Article XII shall survive Closing hereunder.

## XIII. MISCELLANEOUS

### 13.1. No Referrals.

(a) No amount paid or service provided pursuant to this Agreement is intended to be, nor shall it be construed to be, an inducement, payment or remuneration for (i) referring an individual to the St. Luke's Entities or their Affiliates, on the one hand, or to any of the Warren Companies, on the other hand, for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal or state health care program; or (ii) purchasing, leasing, ordering or arranging for, or recommending purchasing, leasing or ordering, any good, facility, service or item for which payment may be made in whole or in part under a federal or state health care program. The terms of this Agreement do not take into account the value or volume of any referrals, payment for referrals for medical services or any other business generated between the St. Luke's Entities or their Affiliates, on the one hand, and the Warren Companies, on the other hand. The Parties hereto intend that this Agreement shall be applied and construed in a manner that does not create an arrangement that would violate the provisions of the Medicare/Medicaid Anti-kickback Statute, 42 U.S.C. §1320a-7b, Patient Ethics in Referral Act, 42 U.S.C. §1395nn, and any comparable Pennsylvania or New Jersey laws.

(b) The parties recognize that this Agreement is subject to, and agree to comply with, applicable Government Requirements. In accordance therewith, the parties shall perform the duties and obligations hereunder in compliance with, and not in violation of, 42 U.S.C. § 1320a-7b(b) (commonly referred to as the "Anti-Kickback Statute") and 42 U.S.C. § 1395nn (commonly referred to as the "Stark Law"), and all regulations and other guidance related to the Anti-Kickback Statute and the Stark Law. Any provisions of applicable Government Requirements that invalidate any term of this Agreement, or would cause a party to be in violation of the law, shall be deemed to have superseded the terms of this Agreement; provided, however, that the parties hereto shall use their best efforts to accommodate the terms and intent of this Agreement to the greatest extent possible. Within thirty (30) days after the

execution of this Agreement, Warren shall notify St. Luke's if any St. Luke's entity meets the definition of "Covered Persons," as defined in the Corporate Integrity Agreement between Warren Hospital and the Office of the Inspector General of the Department of Health and Human Services, dated as of December 5, 2007, Warren shall provide written notice of such determination to St. Luke's (the "Covered Persons Notice"). Following St. Luke's receipt of such notice, St. Luke's shall either (a) comply with Warren's Corporate Compliance Program, including training related to the Anti-Kickback Statute and the Stark Law; or (b) provide written notice to Warren terminating this Agreement.

### 13.2. Public Announcements.

Any public announcement or similar publicity with respect to this Agreement, the Transactions, the termination of this Agreement or the failure to close the Transaction will be issued, if at all, at such time and in such manner as the Parties shall mutually agree in writing. Unless consented to by the Parties in advance or required by Legal Requirements, each Party shall keep this Agreement strictly confidential and may not make any disclosure of this Agreement or its terms or conditions to any Person (except to such Party's professionals, including, without limitation, legal, accounting, and consulting professionals). The Parties shall consult with each other concerning the means by which the Warren Companies' employees, patients, physicians, suppliers and others having dealings with the Warren Companies will be informed of the Transaction, and its status as its progresses. Notwithstanding the foregoing, the Warren Entities shall make no statements to the Warren Companies' employees, patients, physicians, suppliers and others having dealings with the Warren Companies without St. Luke's prior consent. The representatives of the St. Luke's Entities shall have the right to have a designated person present for any such communication that occurs in person.

### 13.3. Confidentiality.

To the extent not inconsistent with this Agreement, the Confidentiality Agreement dated September 29, 2010, as amended, executed by the Parties (the "Confidentiality Agreement") shall continue in full force and effect according to its terms, which are incorporated herein by reference as if set forth in their entirety. Except as permitted or required by law, each party will not use or disclose patient information in a manner that would violate the requirements of 45 CFR Section 160.504 and 164.506(c) known as HIPAA Privacy and Security Standards contained in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA Act") and the requirements and regulations pursuant to the Federal Health Information Technology for Economic and Clinical Health Act (the "HITECH Act") which are incorporated herein by reference. In addition, each party expressly agrees to comply with the HIPAA Act and the HITECH Act in all respects, including the implementation of all necessary safeguards to prevent such disclosure and the assurance that any subcontractors or agents to whom either party provided protected health information agree to the same restrictions and conditions imposed on the parties hereto under the HIPAA Act and the HITECH Act.

### 13.4. Cooperation; Further Assurances.

Each Party agrees to cooperate fully with the other Parties to carry out the Transaction, shall use its reasonable efforts to cause satisfaction of the conditions to consummation of the

Transaction, and shall refrain from any actions inconsistent with this Agreement. Each Party shall, upon request of any of the other Parties, at any time and from time to time, execute, acknowledge, deliver and perform all such further acts, deeds and instruments of further assurance as may be reasonably deemed necessary or advisable to carry out the provisions and intent of this Agreement.

### 13.5.  **Binding Effect.**

The provisions of this Agreement shall extend to, bind and inure to the benefit of the Parties and their respective successors and assigns as permitted by this Agreement. Notwithstanding anything stated to the contrary in this Agreement, this Agreement is intended solely for the benefit of the Parties and is not intended to, and shall in no way create enforceable third party beneficiary rights.

### 13.6.  Governing Law; Dispute Resolution.

This Agreement shall be deemed to have been made and shall be construed and interpreted in accordance with the internal laws of the Commonwealth of Pennsylvania, without application of its conflicts of laws provisions. In any equitable action for specific performance or injunctive relief, the parties hereby submit to the jurisdiction of the courts of Lehigh County, Commonwealth of Pennsylvania. Except for actions for specific performance or injunctive relief, if a dispute or claim should arise that does not get resolved through negotiation of the parties, the parties shall attempt in good faith to resolve the dispute or claim by mediation administered by the American Health Lawyers Association (AHLA) under its mediation rules, before resorting to arbitration. Either party may initiate mediation by filing a submission to mediation with AHLA. The mediation shall be conducted in Allentown, Pennsylvania. If the matter has not been resolved by mediation within sixty (60) days of the initiation of such procedure, or if either party refuses to participate in the mediation, the controversy shall be resolved by binding arbitration under the Arbitration Rules of the AHLA, by one neutral arbitrator. Either party may initiate arbitration by filing a demand for arbitration with the AHLA and judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. The arbitration shall be conducted in Allentown, Pennsylvania. The arbitrator shall be an attorney specializing in business litigation who has at least fifteen (15) years of experience with a law firm of over twenty-five (25) lawyers or was a judge of a court of general jurisdiction. Within thirty (30) days of initiation of arbitration, the parties shall reach agreement upon the arbitrator and the procedures to be followed to assure that the arbitration will be concluded and the award rendered within no more than six (6) months from selection of the arbitrator. Failing such agreement, the AHLA will designate the arbitrator and parties will follow the procedures established by the arbitrator. Each party has the right before or during the arbitration to seek and obtain from the appropriate court provisional remedies such as attachment, preliminary injunction, replevin, or such similar type of equitable remedies, to avoid irreparable harm, maintain the status quo or preserve the subject matter of the arbitration. The arbitration proceedings, together with all discovery made pursuant thereto and statements or documents exchanged by the parties in connection therewith, shall be kept confidential and shall only be used by such parties in connection with the arbitration proceedings. THE ARBITRATOR SHALL NOT AWARD ANY PARTY PUNITIVE OR EXEMPLARY DAMAGES, AND EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT TO

SEEK SUCH DAMAGES. All costs of mediation or arbitration shall be evenly divided between the parties, exclusive of each party's legal fees, each of which shall be borne by the party that incurs them.

### 13.7.  Entire Agreement; Amendment.

This Agreement, the Confidentiality Agreement, the schedules and exhibits attached hereto, and any written amendments to any of the foregoing to be entered into prior to the Effective Date shall constitute the entire agreement of the Parties and supersede all negotiations, the LOI, preliminary agreements and prior or contemporaneous discussions and understandings of the Parties in connection with the subject matter hereof. The Parties specifically acknowledge that in entering into and executing this Agreement, the Parties rely solely upon the representations, warranties, covenants and agreements contained in this Agreement and no others. No changes in or additions to this Agreement shall be recognized unless and until made in writing and signed by all the Parties.

### 13.8.  Assignment.

This Agreement and the rights, title, and interests hereunder shall not be assigned without the prior written consent of the other Parties. Even where such consent is obtained, no such assignment by a Party to this Agreement of its right, title and interest hereunder shall relieve such Party of its obligations hereunder unless the other Parties otherwise agree.

### 13.9.  Waiver.

Any Party may waive the benefit of a term or condition of this Agreement and such waiver shall not be deemed to constitute the waiver of another breach of the same, or any other, term or condition. However, the Parties specifically acknowledge and agree that any Party's execution of this Agreement shall not operate as, or be deemed to be, a waiver of any issue or matter relating to due diligence information requested or provided by the other Parties prior to execution hereof.

### 13.10.  Headings.

The headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of any provision of this Agreement.

### 13.11.  Notices; Correspondence; Meetings.

To the extent permitted by all applicable Legal Requirements, each Party shall have the right to review in advance all descriptions of the Transaction which appear in any filing made in connection with the Transaction by the other Parties. Each Party shall promptly notify the other of any communication it or any of its Affiliates receives from any Government Body relating to the Transaction and matters addressed by this Agreement and permit the other Parties to review in advance, to the extent permitted by Legal Requirements, any proposed communication to any Government Body relating thereto. Each Party agrees not to participate in any meeting with any Government Body in respect of any filings, investigation or inquiry unless it consults with the

688197.15

other in advance and, to the extent permitted by such Government Body, gives the other Parties the opportunity to attend and participate at such meeting.

All notices, demands and requests required to be given or which may be given shall be in writing and shall be deemed to have been properly given (a) if delivered personally, on the date of such delivery, (b) if sent by United States registered or certified mail, return receipt requested, postage prepaid, on the date of delivery as evidenced by such receipt, or (c) upon delivery by Federal Express or a similar overnight courier service which provides evidence of delivery, on the date of delivery as so evidenced, if addressed as follows:

|  |  |
|---|---|
| If to Warren:<br>(on behalf of all the<br>Warren Entities) | Warren Healthcare, Inc.<br>185 Roseberry Street<br>Phillipsburg, NJ 08865<br>Attn: Thomas H. Litz, President and CEO |
| with a copy to: | McCarter and English, LLP<br>100 Mulberry Street<br>Four Gateway Center<br>Newark, NJ 07102<br>Attn: Scott Kobler, Esquire |
| If to St. Luke's:<br>(On behalf of all the<br>St. Luke's Entities) | St. Luke's Health Network, Inc.<br>801 Ostrum Street<br>Bethlehem, PA 18015<br>Attn: General Counsel |
| with a copy to: | Saul Ewing LLP<br>1500 Market Street<br>Center Square West, 38th Fl.<br>Philadelphia, PA 19102<br>Attn: Bruce D. Armon, Esquire |

**13.12.  Fees and Expenses.**

Except as otherwise provided in Section 11.2 hereof, the fees and expenses incurred by each Party in connection with the Transaction shall be borne by that Party.

**13.13.  No Third Party Beneficiaries.**

The terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective successors and permitted assigns and it is not the intention of the Parties to confer, and this Agreement shall not confer, third party beneficiary rights upon any other Person.

688197.13

### 13.14.  Counterparts; Facsimile Signature.

This Agreement may be executed in one or more counterparts, and by facsimile signature or electronic transmission by Adobe (PDF), each of which shall be deemed an original, but all of which together shall constitute a single agreement.

*[Signature Page Follows]*

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by a duly authorized officer as of the date first written above.

ST. LUKE'S HEALTH NETWORK, INC.

By: _____
   Senior Vice President, Finance

WARREN HEALTHCARE, INC.

By: _____
   Chief Executive Officer

SAINT LUKE'S HOSPITAL OF BETHLEHEM D/B/A ST. LUKE'S HOSPITAL & HEALTH NETWORK

By: _____
   Senior Vice President, Finance

WARREN HOSPITAL

By: _____
   Chief Executive Officer

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by a duly authorized officer as of the date first written above.

ST. LUKE'S HEALTH NETWORK, INC.

By: _____
    Senior Vice President, Finance

WARREN HEALTHCARE, INC.

By: _____
    Chief Executive Officer

SAINT LUKE'S HOSPITAL OF BETHLEHEM D/B/A ST. LUKE'S HOSPITAL & HEALTH NETWORK

By: _____
    Senior Vice President, Finance

WARREN HOSPITAL

By: _____
    Chief Executive Officer

688197.15

65