**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

—————————————————————
:
LIBERTY BELL CAPITAL II, L.P.,    :
:
           Plaintiff,    :
    v.    :    Civil Action No. 3:13-cv-4241-BRM-TJB
:
:
WARREN HOSPITAL, WH MEMORIAL  :
PARKWAY INVESTORS, L.L.C.,    :    **OPINION**
WARREN HEALTH CARE ALLIANCE,  :
P.C., and TWO RIVERS ENTERPRISES,  :
INC.,    :
:
           Defendants.    :
—————————————————————:

**MARTINOTTI, DISTRICT JUDGE**

Before this Court are: (1) Defendants Warren Hospital ("Warren Hospital"), WH Memorial
Parkway Investors, L.L.C. ("WHMPI"), Warren Health Care Alliance, P.C. ("WHCA"), and Two
Rivers Enterprises, Inc.'s ("Two Rivers") (collectively, "Defendants") Motion for Summary
Judgment (ECF No. 68); and (2) Plaintiff Liberty Bell Capital II, L.P.'s ("Plaintiff") Motion for
Summary Judgment (ECF No. 70). Both motions are opposed. (ECF Nos. 73 and 74.) The Court
heard oral argument on the motions on June 26, 2017 (ECF No. 82), pursuant to Federal Rule of
Civil Procedure 78(a), and reserved its decision. For the reasons set forth below and for good cause
having been shown, Plaintiff's Motion is **DENIED** and Defendants' Motion is **GRANTED**.

# I. BACKGROUND[1]

This litigation arises from Defendants' transfer of its controlling interest in a company to a third party, which resulted in Plaintiff's inability to acquire certain property, allegedly in violation of Defendants' agreement with Plaintiff. Defendants and other third-party entities formed intricate business relationships and are closely related to each other. The parties disagree on the extent to which the Court should consider these relationships. Although the complex and intertwined relationships between these entities is ultimately of little import to the Court's decision, an overview is provided for the ease of the reader.

## A. Parties

WHCA, WHMPI, and Two Rivers are affiliates of Warren Hospital. Warren Hospital is the sole stockholder of Two Rivers, which is the sole member of WHMPI. WHMPI and non-party InMed Investors, L.L.C. ("InMed") were each 50% members of Hillcrest Medical Plaza, L.L.C. ("Hillcrest"), a holding company for property located in Phillipsburg, NJ 08865 (the "Property") and the subject of this lawsuit.

Hillcrest's acquisition of the Property was financed by a loan from Wachovia Bank (the "Loan"), which was assigned to Wells Fargo. WHMPI served as the sole managing member of Hillcrest and was therefore the controlling member; InMed was the non-managing member. Several agreements allegedly restricted any change in this ownership, including: (1) a September 5, 2003 Mortgage and Security Agreement between Hillcrest and Wachovia; (2) a September 5, 2003 Letter of Credit and Reimbursement Agreement between Hillcrest and Wachovia; (3) a June

---

[1] At oral argument, the parties agreed no material facts were in dispute and this case was ripe for adjudication by the Court. (*See* Tr. of Oral Arg. (ECF No. 84) at 32:5-33:5.) Accordingly, the Court will construe any material facts as undisputed and forgo some of its standard citations to the record in order to provide a comprehensive overview of the parties' relationships and business history leading to this litigation.

2, 2010 Forbearance Agreement between Hillcrest and Wells Fargo; (4) an August 3, 2010 Forbearance Agreement between Hillcrest and Wells Fargo; and (5) Hillcrest's Operating Agreement. (Pl.'s Statement of Mat. Facts (ECF No. 70-3), Exs. C, E, F, G.)

At the time of the foreclosure proceedings, discussed below, Warren Hospital leased the Property from Hillcrest and, in turn, subleased the Property to WHMPI, who subleased portions of the Property to WHCA, Two Rivers, and Warren Hospital.

**B. Foreclosure Proceedings and InMed Litigation**

On February 15, 2010, Warren Hospital stopped paying rent causing Hillcrest to default on the Loan. (Defs.' St. of Mat. Facts (ECF No. 68-4) ¶ 8 and Pl.'s Resp. to Defs.' St. of Mat. Facts (ECF No. 74-1) ¶ 8.) Defendants attempted to "save the hospital from shutting down" (Defs.' Resp. to Pl.'s St. of Mat. Facts (ECF No. 73-3) ¶ 9), starting the following chain of events which Plaintiff alleges interfered with their contractual right to take possession of the Property.

On September 1, 2010, InMed brought suit against Warren Hospital, WHMPI, Hillcrest and Two Rivers in the Superior Court of Warren County, New Jersey (the "InMed Litigation"), alleging that WHMPI had breached its fiduciary duties to InMed by not trying to retain title to the Property and failing to collect rent from Warren Hospital. (ECF Nos. 68-4 ¶¶ 12-13 and 74-1 ¶¶ 12-13.) InMed wanted control of Hillcrest in order to "collect past due rent from [Warren] Hospital and [to] fight to stop the foreclosure process." (ECF Nos. 68-4 ¶ 14 and 74-1 ¶ 14.)

On January 29, 2011, Wells Fargo initiated foreclosure proceedings (ECF Nos. 68-4 ¶ 15 and 74-1 ¶ 15), and on July 11, 2011, Wells Fargo obtained a foreclosure judgment in its favor from the Superior Court (ECF Nos. 68-4 ¶ 17 and 74-1 ¶ 17).

### C. Post Foreclosure Agreements

#### 1. St. Luke's Definitive Agreement and Wells Fargo Post Foreclosure Agreement

On April 22, 2011, Defendants entered into a "Definitive Agreement" with St. Luke's Health Network ("St. Luke's") in which St. Luke's would acquire Warren Hospital. (ECF No. 68-4, Ex. 9.) As a condition of the St. Luke's Definitive Agreement, Wells Fargo entered into a Post Foreclosure Agreement ("Wells Fargo PFA") with Defendants. (*See id.* at Ex. 9, Sec. 10.5 and Ex. 10.) The Wells Fargo PFA provided that, if Wells Fargo obtained title to the Property as a result of the Sheriff's Sale, the post-foreclosure conditions required in the St. Luke's Definitive Agreement would be met. (ECF Nos. 68-4 ¶ 26 and 74-1 ¶ 26.) The Wells Fargo PFA would terminate if Hillcrest's debt was sold. (ECF Nos. 68-4 ¶ 28 and 74-1 ¶ 28.)

#### 2. Sale of Hillcrest's Debt

Titan Loan Investment Fund LP ("Titan"), a privately held company in the business of buying distressed loans, expressed interest in acquiring the debt owed by Hillcrest to Wells Fargo. (ECF Nos. 68-4 ¶¶ 29-30 and 74-1 ¶¶ 29-30.) Titan spent several months performing due diligence, which included inspecting the Property, obtaining financial information, learning about the Hospital's financial condition and prospects, and reviewing the Definitive Agreement with St. Luke's and the Wells Fargo PFA. (ECF Nos. 68-4 ¶ 31 and 74-1 ¶ 31.)

On June 27, 2011, Titan acquired Hillcrest's debt through a Loan Purchase Agreement with Wells Fargo, thereby terminating the Wells Fargo PFA, and immediately transferred the debt to Plaintiff. (ECF Nos. 68-4 ¶¶ 33-34, 36 and 74-1 ¶¶ 33-34, 36.) To meet the conditions of the St. Luke's Definitive Agreement, a new post foreclosure agreement was required and was eventually formed, as outlined below, between Plaintiff and Defendants. (ECF Nos. 68-4 ¶ 32 and 74-1 ¶ 32.)

Defendants contend Plaintiff "was fully aware of InMed's desire to have Hillcrest retain title to the Property, the InMed Litigation, the Definitive Agreement and the Wells Fargo PFA." (ECF No. 68-4 ¶ 35.) Plaintiff concedes knowledge but argues it "relied upon representations that the Superior Court had rejected In[M]ed's attempts to interfere" (ECF No. 74-1 ¶ 35), and that Defendants knew of Plaintiff's intentions to "acquire the [P]roperty as soon as possible, . . . bid on the [P]roperty at the sheriff's sale, and . . . repair, market, and lease the vacant space." (ECF No. 70-3 ¶ 20.)

### 3. Plaintiff's Post Foreclosure Agreement

On November 2, 2011, Plaintiff and Defendants entered into their own Post Foreclosure Agreement (the "PFA") pursuant to the Definitive Agreement. (ECF No. 68-4, Ex. 14.) The PFA provided for Plaintiff to become owner of the Property, execute new leases with the then-tenants, and reduce Warren Hospital's rent. (ECF Nos. 70-3 ¶ 13 and 73-3 ¶ 13.) Further, the Post Foreclosure Agreement stated, in pertinent part:

> **<u>RECITALS</u>**
>
> . . . .
>
> H. [Wells Fargo] and [Plaintiff] have entered into an agreement pursuant to which [Wells Fargo] agreed to sell to [Plaintiff] [Hillcrest]'s indebtedness under the Loan Documents (the "Loan") and assign the Loan Documents, the Foreclosure Judgment and all rights thereunder to [Plaintiff] (the "Loan Purchase Agreement"). Closing under the Loan Purchase Agreement occurred on August 5, 2011, and a judicial sale of the Property is pending.
>
> . . . .
>
> Q. [Plaintiff] is prosecuting a foreclosure proceeding under the Mortgage (the "Foreclosure Proceeding") . . . . [Defendants] believe it is in the collective best interests of [Warren Hospital, WHCA, and Two Rivers (the "Hospital Entities")] and [t]hird [p]arty [s]ubtenants that [Defendants] enter into this Agreement because a sheriff's sale of the Property resulting from the Foreclosure

Proceeding (a "Sheriff's Sale") will cause the Master Lease and Master sublease to terminate by operation of law on account of the foreclosure and, absent this Agreement, such terminations could result in a severe disruption of the operation of the Hospital Entities and the provision of medical care by the Hospital Entities and the various medical practices which are run by the [t]hird [p]arty [s]ubtenants. Accordingly, [Defendants] and [Plaintiff] wish to enter into this Agreement pursuant to which (i) [Defendants] consent to and shall not contest, stay, or otherwise delay the Foreclosure Proceeding, the Sheriff's Sale, or the [c]ash [c]ollateral [a]ctions, (ii) [WHMPI] and [Warren Hospital] will, subject to the terms and conditions of this Agreement, . . . cause the Hospital Entities and the [t]hird [p]arty [s]ubtenants to enter into non-disturbance and attornment agreements . . . with [Plaintiff] whereby, in the event [Plaintiff] acquires the Property at the Sheriff's Sale, each of the [subleases] will become direct leases with [Plaintiff], as landlord . . . .

      . . . .

**1. Definitions.** . . .

1.1     "Title Acquisition Date" shall mean the date on which [Plaintiff] . . . receives a recorded sheriff's deed for the Property under which [Plaintiff] . . . acquires title to the Property as a result of the Sheriff's Sale.

**2. No Contest; Communication with Consultant.**

2.1     [Defendants] hereby consent to the Foreclosure Proceeding, any Sheriff's Sale, and, to the extent that they have legal standing to do so, the [c]ash [c]ollateral [a]ctions and acknowledge and agree that sufficient legal justification exists for the Foreclosure Proceeding, any Sheriff's Sale, and the [c]ash [c]ollateral [a]ctions. [Defendants] shall not contest, cause the stay of, or otherwise delay the Foreclosure Proceeding, any Sheriff's Sale, or the [c]ash [c]ollateral [a]ctions. [Defendants] shall take such actions in or with respect to the Foreclosure Proceeding, any Sheriff's Sale, or the [c]ash [c]ollateral [a]ctions as the [Plaintiff] may reasonably request to effectuate the terms and provisions and purposes of this Agreement.

      . . . .

**4. [St. Luke's] Transaction; Loan Acquisition.**

      . . . .

4.2    [Defendants] acknowledge and agree that [Plaintiff]'s obligations under [portions] of this Agreement are conditioned upon the satisfaction of the following (the "Conditions"): (a) [Hillcrest] refraining from contesting, causing the stay of, or otherwise delaying the Foreclosure Proceeding or [c]ash [c]ollateral [a]ctions; (b) [St. Luke's] completing closing the transactions contemplated under and in accordance with the St. Luke's Definitive Agreement (the "Transaction"), and (c) no Agreed Rent being past due and owing. In the event that Hospital or [St. Luke's] shall definitively determine not to proceed with the Transaction, the same shall be deemed a failure of the Conditions and Hospital shall immediately provide written notice of the same to [Plaintiff].

      . . . .

**5. Miscellaneous.**
5.1    <u>Binding Effect.</u> . . . To induce [Plaintiff] to enter into this Agreement, [Defendants] represent and warrant to [Plaintiff] that (a) they have the right, power, and authority and have taken all necessary corporate or other organizational action to duly authorize the execution, delivery, implementation, and performance of and compliance with this Agreement and all agreements, instruments, and documents executed or delivered by them or any of them pursuant hereto or in connection herewith, and (b) the execution and delivery of this Agreement and all agreements, instruments, and documents executed or delivered by them or any of them pursuant hereto or in connection herewith will not conflict with or result in a breach of the terms or conditions of the organizational documents of [Defendants] or any agreement to which [a Defendant] is a party.

(ECF No. 68-4, Ex. 14.)

**D. Sheriff's Sale**

On or around November 21, 2011, InMed filed a motion for an Order to Show Cause in state court seeking to postpone the Sheriff's Sale, scheduled for November 28, 2011, so that InMed had additional time to raise the funds to redeem the Property. (ECF Nos. 68-4 ¶ 42 and Ex. 15;

ECF No. 74-1 ¶ 42.) Plaintiff, a non-party to the InMed Litigation, opposed the delay but acknowledged InMed's right of redemption, stating:

> In[M]ed can participate in the [S]heriff's [S]ale or pay off the judgment on behalf of Hillcrest before or even after the sale. It is not, however, entitled to any special considerations . . . . InMed can pay before Monday, it can bid at the Sale, or it can effectuate a redemption by Hillcrest within ten (10) days after the Sale. It should not now be permitted to delay the sale further.

(ECF No. 68-4, Ex. 16 at 6.) Plaintiff now argues "the fact that the redemption period was pending did not mean that the Defendants could legally assist In[M]ed without breaching their agreements." (ECF No. 74-1 ¶ 43.)

On November 27, 2011, in further support of its motion, InMed notified the state court it was ready to settle the InMed Litigation by dismissing its complaint if Defendants transferred their interest in Hillcrest to it. (ECF No. 68-4, Ex. 19.) Plaintiff was copied on the correspondence. (*Id.*) Additionally, Plaintiff appeared the following day for the hearing on the Order to Show Cause and participated in oral arguments. (ECF No. 68-4, Ex. 20.) At the hearing, the parties' positions were confirmed—InMed was prepared to settle the InMed Litigation so long as it was "allowed to take over Hillcrest's position vis-à-vis [Plaintiff] and redeem the property" (*id.*, Ex. 20 at 22:22-23:3); whereas Plaintiff had "every intention of taking title [and] . . . every intention of bidding to the full amount if somebody [was] there who want[ed] the property" (*id.*, Ex. 20 at 34:24-35:1). But most significantly, Defendants stated:

> . . . Your Honor, we think it's in everyone's best interest to proceed with the foreclosure, and then if InMed can get its transaction to come together they have a redemption period . . . within which to t    [sic] to redeem the    ro ert  , [sic] which in view [sic] would require them to acquire [WHMPI]'s fifty percent interest in Hillcrest.

(*Id.*, Ex. 20 at 24:20-25:2.)

Plaintiff's counsel spoke after Defendants and did not challenge the possibility of redemption. He added only:

> What we see here is we have [Plaintiff] on the one hand which has a contract that allows it the remedy of foreclosure, assuming it jumps through all the hoops and does all of the procedural things that the [l]egislature and the courts have established are necessary in order make [sic] sure that we don't have an unnecessary forfeiture. [Plaintiff] has done that. [Plaintiff] has a contract right. I'm standing here trying to enforce.

(*Id.*, Ex. 20 at 30:21-31:4.)

Judge Accurso denied InMed's application to stay the Sheriff's Sale and it went forward as scheduled on November 28, 2011 (*id.*, Ex. 20 at 48:6-7); Plaintiff was the only bidder. (ECF Nos. 70-3 ¶ 18 and 73-3 ¶ 18.)

### E. Ten-Day Redemption Period

Plaintiff contends the Property was effectively sold to it as a result of the Sheriff's Sale, having only to wait out the ten-day redemption period. (ECF No. 74-1 ¶ 49; *see* ECF No. 68-4, Ex. 21.) Plaintiff acknowledges "that there was a ten-day redemption period, but . . . denie[s] . . . the parties' agreements left [redemption] as a real possibility. . . . [T]he terms of the [PFA] prohibited the Defendants from assisting In[M]ed to redeem the [] Property through transferring control of Hillcrest." (ECF No. 74-1 ¶ 49.)

On December 7, 2011, prior to expiration of the redemption period, counsel for Warren Hospital informed Plaintiff that WHMPI would likely be transferring its 50% interest to InMed as part of the InMed Litigation settlement. (ECF Nos. 68-4 ¶ 52; 70-3 ¶ 22; 73-3 ¶ 22; 74-1 ¶ 52.) Plaintiff argues Defendants were not "forthright about their intentions." (ECF No. 74-1 ¶¶ 53-55.) Two phone calls took place that day, and the parties dispute what was said and the terms under which, if any, Plaintiff would permit redemption. For example Defendants state, and Plaintiff

disputes, "Everyone understood that the only way [redemption] could happen is if WHMPI caused Hillcrest to redeem with InMed's money, or WHMPI transferred its interest to InMed and InMed then caused Hillcrest to redeem." (ECF No. 68-4 ¶ 57.) Defendants also allege, and Plaintiff denies, "[Plaintiff] was told that it was likely that the loan would be repaid in full. Everyone on the call knew that this could happen only if Hillcrest was to redeem the Property." (*Id.* ¶ 55.)

On December 8, 2011, the InMed Litigation settled, WHMPI transferred its 50% controlling interest in Hillcrest to InMed, and InMed caused Hillcrest to exercise its right of redemption by paying the unpaid balance owed under the judgment. (ECF No. 68-4 ¶¶ 60-62; 70-3 ¶ 23; 73-3 ¶ 23; 74-1 ¶¶ 60-62.)

As a result, Plaintiff argued it was unable to purchase the property as intended. However, Defendants point out that, on December 19, 2011, Plaintiff reported to its partners:

> We are pleased to inform you that, after extensive litigation and a foreclosure action, the Borrower redeemed the commercial loan asset held by the Partnership of December 8, 2011. . . . The Partnership has now been fully repaid the legal debt that was due on the loan. . . . Based on the distribution made to all the Partners today, the Partnership produced an Internal Rate of Return of 73.48% and the investors earned a Net Multiple of 1.144x on their investment.

(ECF No. 68-4, Ex. 27.) Plaintiff contends this return did not meet the investor's expectations. (ECF No. 74-1 ¶ 63.)

Plaintiff argues Defendants interfered with the foreclosure process in violation of the Post Foreclosure Agreement by transferring their interest in Hillcrest to InMed, causing Hillcrest to exercise its right of redemption. In essence, despite the morass of transactions and interrelationships by and between the various parties and entities, this matter turns on the Court's interpretation of the PFA, namely, whether or not the Defendants' sale to InMed—and InMed's

exercise of the right of redemption—violated the express terms of PFA, or, alternatively, whether Defendants' conduct breached a duty of good faith and fair dealing.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative

evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## III. DECISION

The Court is faced with two opposing motions for summary judgment. Therefore, both parties have the burden of showing no genuine issue of material fact exists before the other party must present specific facts showing there is a genuine issue for trial. However, no party bases its motion on the existence of questions of fact, and therefore—although a survey of the respective responses to the Local Civil Rule 56.1(a) statements presented to the Court may show otherwise—

the disputed facts are not material. Further, counsel are in agreement summary judgment is the appropriate means to bring this matter to a final disposition.[2] Accordingly, the Court proceeds with its legal analysis.

Plaintiff's allegations of breach of contract and breach of good faith and fair dealing come down to the following issue: whether Defendants interfered with the foreclosure process in violation of the PFA by selling its interest in Hillcrest to InMed with the knowledge that InMed would cause Hillcrest to exercise its right of redemption. Accordingly, the Court must interpret the PFA.

### A. Law of the Case

As an initial matter, Plaintiff alleges this Court is bound by The Honorable Judge Freda L. Wolfson's Opinion on Defendants' Motion to Dismiss, in which Plaintiff contends Judge Wolfson

---

[2] Indeed, the parties agreed the case was ready to be decided as a matter of law based on the present record:

> THE COURT: Okay. Now, do you agree that this case can be decided as a matter of law based on the record before me as we sit here today?
> MR. [NORMAN] GREENSPAN [FOR DEFENDANTS]: Yes, Your Honor. It's my view that once Your Honor decides what the contract says, such as the law between the parties, once that's determined, that these facts are going to – they're basically -- the underlying facts for the most part are undisputed, that that will then determine the results of this case.
> . . . .
> MR. ALAN FRANK [FOR PLAINTIFF]: . . . We both agree that this case is ready for -- and ripe for disposition by Your Honor. What counsel did -- maybe he did say it. We both agree that Your Honor ultimately will decide what the contract means, what it says. . . . You may recall about five weeks back, perhaps six, we waived jointly the jury request. . . . So we really do jointly agree that you should make the call, ball or strike.

(ECF No. 84 at 32:5-33:5; *see also* Consent Order (ECF No. 79) (waiving jury demand in favor of bench trial).)

established the law of the case as follows: (1) the PFA was established so Defendant would

cooperate with Plaintiff in acquiring the Property; and (2) Defendants transferred its interest to

InMed for the purpose of depriving Plaintiff of the Property, which constitutes a breach of the

PFA. The Court is not persuaded by this argument. Judge Wolfson expressly conditioned her

decision on the applicable standard of review for a motion to dismiss—namely, "accept[ing] all

factual allegations as true, constru[ing] the complaint in the light most favorable to the plaintiff,

and determin[ing] whether, under any reasonable reading of the complaint, the plaintiff may be

entitled to relief." (ECF No. 25 at 5 (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d

Cir. 2008).) In reviewing the terms of the PFA and the parties' arguments regarding same, she

stated:

> *Plaintiff alleges* that, under this [section 2.1 of the PFA],
> Defendants were contractually obligated to refrain from exerting
> any interference that would jeopardize Plaintiff obtaining title and
> possession to the Property, including directing Hillcrest to exercise
> its right of redemption. While Defendants argue that there is no
> express language in the Agreement defining Defendants'
> obligations regarding redemption or any other actions after the
> sheriff sale, *it is Plaintiff's position that* Defendants not only
> "agreed not to contest the foreclosure and sheriff sale," but also "to
> provide all cooperation necessary to effect Liberty Bell's acquisition
> of the Property." Amend. Compl., ¶ 31. Importantly, *Plaintiff avers*
> that such cooperation from Defendants was one of the hallmark
> purposes of the Post-Foreclosure Agreement. *Id.* at ¶ 33. And,
> according to the Section 2.1 of the Agreement, Defendants assented
> to take actions "in or with respect to the Foreclosure Proceeding,
> and Sheriff's Sale . . . as the Lender [Liberty Bell] may reasonably
> request to effectuate the terms and provision and **purposes** of this
> Agreement." Post-Foreclosure Agreement, Ex. A § 2.1 (emphasis
> added). . . .
> . . . .
> I note that the term "purposes" is not defined in the Post-
> Foreclosure Agreement. Nonetheless, *at this pleading stage,*
> *Plaintiff has sufficiently alleged* that one of the purposes of the
> Agreement is that Defendants must take, or refrain from taking,
> certain actions in order to cooperate with Plaintiff in its goal of
> obtaining title to the Property. In that regard, *taking as true the*

> *allegation,* that Defendant relinquished control of Hillcrest to InMed
> for the purpose of depriving Plaintiff of the right to procure title to
> the Property, constitutes a breach of the Post-Foreclosure
> Agreement. At the very least, discovery should proceed on the issue
> whether the parties agreed and intended for the Post-Foreclosure
> Agreement to govern their respective obligations post sheriff sale.

(ECF No. 25 at 9-10 (emphasis in italics added).)

The Court has the added benefit of discovery, a complete record, and a standard of review that allows the Court to look beyond the pleadings on a summary judgment motion, a factor Judge Wolfson expressly took into consideration in limiting her review to Plaintiff's allegations in the Amended Complaint. (*See id.* at 2 n.1.) Accordingly, the Court is not bound by any perceived findings from the opinion denying Defendants' Motion to Dismiss.

### B.  PFA Interpretation

Plaintiff argues the PFA was intended to help Plaintiff acquire title to the Property and govern the parties' obligations during the foreclosure process in support of that goal. Plaintiff asks the Court to take the parties' actions into consideration when reviewing the terms of the PFA. On the other hand, Defendants argue it was bound by the plain language of the PFA, which did not prohibit its actions. Specifically, Defendants contend it complied with the express language of the PFA and that "[t]here is nothing in this language that supports [Plaintiff]'s proposition that it was the intent of the parties that Defendants not interfere in any way with [Plaintiff]'s efforts to acquire title to the Property, or assist Hillcrest in its effort to redeem." (Defs.' Br. (ECF No. 68-1) at 18.)

In interpreting the PFA, summary judgment is appropriate when the Court is satisfied that "the contract is so clear it can only be read one way." *Pennbarr Corp., Ins. Co. of No. Am.*, 976 F.2d 145, 149 (3d Cir. 1992). If a contract is clear and unambiguous, the Court may interpret the contract as a matter of law. *Indian Coffee Corp. v. Procter & Gamble Co.*, 752 F.2d 891, 894 (3d Cir.), *cert. denied*, 474 U.S. 863 (1985). However, where parol evidence is needed to interpret the

contract, summary judgment may not be appropriate. *Great Atl. & Pac. Tea Co. v. Checchio*, 762 A.2d 1057, 1061-62 (N.J. Super. Ct. App. Div. 2000). "The interpretation of the terms of a contract are decided by the court as a matter of law unless the meaning is both unclear and dependent on conflicting testimony." *Bosshard v. Hackensack Univ. Med. Ctr.*, 783 A.2d 731, 740 (N.J. Super. Ct. App. Div. 2001).

The parties agree the Court has all the evidence it needs to interpret the PFA and render a judgment in favor of either Plaintiff or Defendants. Upon a thorough review of the PFA, the Court finds the express terms of the Agreement do not require Defendants to assist Plaintiff in acquiring title. Rather, the PFA expressly details Defendants' interest in protecting its leases and subleases in order to prevent "severe disruption of the operations of the Hospital Entities and the various medical practices" (*id.*, Ex. 14, Sec. Q) and prohibits Defendants from contesting, staying, or delaying the Foreclosure Proceeding (*id.*, Ex. 14, Sec. 2.1). Defendants complied with that language by not only allowing but encouraging the Sheriff's Sale to proceed. (*See id.*, Ex. 20 at 24:20-25:2.) While Plaintiff argues Defendants were required to "take such actions in or with respect to the Foreclosure Proceeding, any Sheriff's Sale, or the [c]ash [c]ollateral [a]ctions as the [Plaintiff] may reasonably request to effectuate the terms and provisions and purposes of this Agreement" (ECF No. 68-4, Ex. 14, Sec. 2.1), the PFA does not detail Plaintiff's interest in acquiring title nor set forth any terms or provisions with respect thereto; the PFA merely states that "a judicial sale of the Property is pending" (*id.*, Ex. 14, Sec. H). Indeed, in Section Q of the PFA, the parties detail Defendants' interests only, followed by: "Accordingly, [Defendants] and

[Plaintiff] wish to enter into this Agreement . . . ." (*Id.*, Ex. 14, Sec. Q.) Plaintiff's interests are not expressly outlined beyond references to the Sheriff's Sale.[3]

Further, the PFA acknowledges a Title Acquisition Date separately from the Sheriff's Sale. (*Id.*, Ex. 14, Sec. 1.1.) Simply because the parties may have been aware of Plaintiff's intentions does not mean the Court can read such a meaning into the express language of the contract. Surely the sophisticated attorneys involved in drafting these agreements would have included more detailed references to the Title Acquisition Date—a defined term in the PFA—if the Defendants' obligations to Plaintiff extended that far.

### C. Breach Of Contract

Plaintiff alleges breach of contract and breach of good faith and fair dealing: "A party alleging a breach of contract satisfies its pleading requirement if it alleges (1) a contract; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party performed its own contractual duties." *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 210 F. Supp. 2d 552, 561 (D.N.J. 2002) (citations omitted). Based on the Court's interpretation of the PFA, the Court cannot find that Defendants breached its express terms. Accordingly, judgment is **GRANTED** in favor of Defendants on Count I.

### D. Breach Of Implied Covenant Of Good Faith And Fair Dealing

Under New Jersey law, all contracts have an implied covenant of good faith and fair dealing, which prohibits either party from doing "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Fields v. Thompson Printing Co.*, 363 F.3d 259, 270 (3d Cir. 2004) (citations omitted); *see Brunswick Hills Racquet*

---

[3] Even those references contemplate non-occurrence of the condition. (*See* ECF No. 68-4, Ex. 14, Sec. Q (stating "*in the event* [Plaintiff] acquires the Property at the Sheriff's Sale") (emphasis added).)

*Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 224–25 (2005); *R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*, 168 N.J. 255, 276 (2001). "A plaintiff may be entitled to relief under the covenant [of good faith and fair dealing] if its reasonable expectations are destroyed when a defendant acts with ill motives and without any legitimate purpose." *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 267 (3d Cir. 2008) (quoting *Brunswick Hill Racquet Club, Inc.*, 182 N.J. at 226); *Graco, Inc. v. PMC Glob., Inc.*, Civ. A. No. 08–1304, 2009 WL 904010 (D.N.J. 2009) ("A defendant who acts with improper purpose or ill motive may be found liable for breaching the implied covenant if the breach upsets the plaintiff's reasonable expectations under the agreement.").

Plaintiff alleges it had a reasonable expectation in acquiring title to the property, which was destroyed when Defendants sold their controlling interest in Hillcrest to InMed, which subsequently caused Hillcrest to exercise its right of redemption in the property. Based on the record before the Court, the Court finds Plaintiff was aware of the redemption period, knew it could not acquire title until that time passed, and knew InMed and Defendants were actively trying to settle the InMed Litigation. The Court is not persuaded by Plaintiff's argument that it did not expect InMed to exercise Hillcrest's right of redemption (*see, e.g.,* ECF No. 74-1 ¶ 49), nor is the Court persuaded Defendants acted "with ill motives and without any legitimate purpose." *DiCarlo*, 530 F.3d at 267. Defendants' intention to protect the master leases and sublease were always its stated priority, even in the PFA, and it had to resolve the InMed Litigation in order for St. Luke's to proceed with its obligations under the Definitive Agreement. Based on the record before the Court, resolution of the InMed Litigation—not sabotaging Plaintiff's acquisition—caused Defendants to transfer its controlling interest in Hillcrest to InMed.

Accordingly, judgment is **GRANTED** in favor of Defendants on Count II.

**IV. CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion for Summary Judgment is **DENIED.** An appropriate order will follow.


*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**


Dated: September 29, 2017